671 A.2d 55

**Donald HOFFMAN, et al.**

v.

**UNITED IRON AND METAL COMPANY, INC., et al.**

**Agnes G. ROESCH, et al.**

v.

**UNITED IRON & METAL COMPANY, INC., et al.**

**Nos. 560, 561, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

Feb. 6, 1996.

---

118

G. Macy Nelson (Anderson, Coe and King, on the brief) Baltimore, for Appellants.

Thomas M. Wood, IV (Nathan D. Adler, Hugh M. Bernstein and Neuberger, Quinn, Gielen, Rubin & Gibber, P.A., on the brief, for appellees, United Iron & Metal, et al.) Baltimore, Gary R. Jones (James A. Frederick and Smith, Somerville &

Case, L.L.C., on the brief, for appellee, David J. Joseph Company) Baltimore, for Appellees.

Argued before WENNER and SALMON, JJ., and JOHN J. GARRITY, retired, Specially Assigned.

SALMON, Judge.

Appellants are a group of thirty-seven individuals who live in the southwest, "Mill Hill" area of Baltimore City and the Benedictine Society of Baltimore City (the Church), which owns land in Mill Hill. Appellants sued United Iron and Metal Co., Inc., United Holding Co., Inc., and United Operating Co., Inc. ("United"), which operated a scrap metal yard and automobile shredding facility ("the Facility") in Mill Hill until October 1, 1990. United sold the operation, but not the land, to the David J. Joseph Co., Inc. ("Joseph"), against whom appellants also filed suit. All appellants, except for two, own or reside on property bordering the Facility's property. Appellants sued in nuisance, negligence, trespass, and strict liability,[1] also alleging they were entitled to punitive damages. On March 1, 1995, the Circuit Court for Baltimore City granted summary judgment in favor of the defendants on all counts. In this appeal from that grant of summary judgment, appellants present the following questions, which have been rephrased for clarity:[2]

---

1. Appellants alleged the operation of the Facility constituted an abnormally dangerous activity.

2. Appellants also ask:

 Whether the trial court's holding that the Plaintiffs below were barred from seeking any remedy for damages resulting from acts committed within three years before the dates on which they filed suit or for damages discovered within three years before the dates on which they filed suit constitutes a denial of their access to courts in violation of Article 19 of the Maryland Declaration of Rights?

 This argument has been rejected by the Court of Appeals. *See Frush v. Brooks*, 204 Md. 315, 324, 104 A.2d 624 (1954) (holding that summary judgment does not impair the constitutional right of trial by jury); *accord Whiting–Turner Contracting Co. v. Coupard*, 304 Md. 340, 359, 499 A.2d 178 (1985) (holding that statute providing that a person may not seek contribution from any architect for damages resulting from

I. Did the motions court err in finding that appellees had acquired a prescriptive right to maintain a nuisance?

II. Did the motions court err in finding that the Facility was a permanent nuisance and, thus, that the statute of limitations barred appellants' claims?

III. Did the motions court err in finding that there was inadequate evidence to warrant the submission of punitive damages to the jury?

To answer these questions, the following legal principles are relevant:

1. Land ownership is not necessary in order to support a nuisance action; lawful possession is sufficient.

2. A minor, if a lawful occupant of land, may recover in nuisance; the nuisance action on behalf of the minor is derivative of the nuisance action filed by the parent.

3. A prescriptive right to maintain a nuisance may be acquired by continuance of the nuisance, uninterrupted, for twenty years.

4. Successive ownership of the operation constituting a nuisance may be tacked to form the twenty-year prescriptive period if there is privity.

5. The prescriptive period does not begin to run until a party has notice of the nuisance.

6. An existing easement may be extinguished by the subsequent purchase of the servient estate by a bona fide purchaser without notice of the easement.

7. The passage of regulations controlling air pollution does not toll the prescriptive period.

8. Adverse use for the prescriptive period results in immunity from liability on the part of the user for his acts of use during the prescriptive period.

---

defective condition of improvement to real property if injury occurs more than ten years after improvement's completion did not violate Article 19 of the Maryland Declaration of Rights).

9. A party must bring a suit for damages as a result of a permanent nuisance, which continues indefinitely, within three years of the time that the permanency of the condition becomes manifest to a reasonably prudent person because there is only one cause of action. Successive actions may be brought for damages to land caused by a temporary nuisance, which is abatable, because each day's continuance of the nuisance constitutes a new cause of action.

10. In order to justify a punitive damage award, a plaintiff must prove, by clear and convincing evidence, that the defendant acted with actual malice.

## *FACTS*

Appellee United has owned and operated the Facility on Wilkens Avenue in Baltimore City, Maryland, since at least 1915, when it opened a junkyard. The business evolved into a high-volume scrap metal processing facility. Complaints about smoke and soot from "burning automobiles for scrap metal" at the Facility began in 1939. The complaints continued throughout the 1940s, 1950s, and 1960s. On May 1, 1971, United began operating an automobile shredder, shredding approximately 60,000 to 80,000 cars per year.

One of the by-products of the use of the shredder was frequent, yet irregular, explosions. If the gas tank was not removed from an automobile before it was shredded, gas or gas vapors in the tank sometimes caused an explosion during the shredding process. The earliest recorded explosion at the Facility was on January 3, 1972. Appellants documented at least 250 explosions between that date and November 24, 1994. The shredder sustained damage from the explosions, frequently causing it to be shut down for repairs. Other by-products were black smoke, soot, dust and "fluff" [3] emitted by the Facility. Particulates covered appellants' cars, porches, windows and laundry. An inspector from the Maryland De-

---

**3.** The "fluff," which could be seen emanating from the Facility, consisted of paper, plastic, fabric, and metal particles.

partment of Health and Mental Hygiene sampled dust from the top of a car parked on a street next to the Facility in 1987 and found that the dust contained 5,079 parts per million of lead. Appellants tested the soil in their yards in July 1994, discovering "elevated" levels of lead, which were highest at properties closest to the Facility. Appellants introduced evidence that United tested the soil on Facility property and "fluff" emissions for lead as early as 1988 but did not keep records of the results of these tests. Appellants also complained of excessive, constant noise from the shredding machine and trucks entering and leaving the Facility.

Appellants contend the Facility caused a variety of damage to their homes and interfered with the use and enjoyment of their property. Appellant Dianne Hoffman testified at her deposition that she first noticed the "fluff" and dirt emitted from the Facility in 1975. She stated, "I had a pool for my son ... and I would come out in the morning and I would have to clean that pool out before he could get in and on top of the pool was this fluff...." She also alleged the United operation caused cracked windows, leaky ceilings, leaky and broken pipes, damage to the roof, and shifting of doors, windows, and the foundation of the house. Finally, Mrs. Hoffman stated that the neighborhood was so "unbearable" that she would not allow her children to sit outside on the back porch. Her husband, appellant Donald Hoffman, testified at his deposition that he would see "debris and pieces of metal" on his clothes, in the air, and in his son's pool. He also testified to the damage caused to their home.

Appellant Clara B. Mullins testified at her deposition that in 1973 a "great big piece of metal, hot metal" flew through her back window. She found it lying on her freezer after one of the explosions. She stated that United sent someone to her house to repair the window.

Appellant Janet I. Greenhalgh testified at her deposition that the explosions caused cracks in the walls and made the drywall on her ceiling collapse. Mrs. Greenhalgh's son, appellant Charles S. Hayes, testified at his deposition that he began

noticing the explosions when he moved into his mother's house in 1981. He also claimed that the constant noise and frequent explosions aggravated his post-traumatic stress disorder (PTSD),[4] which first manifested itself in the 1970s after his tours of duty in Vietnam.

Appellant Alice Clifton testified at her deposition that the explosions caused cracks in her ceilings and broke windows in her home. She stated that she could no longer sit on her back porch "because it's nothing to look at but dirt and filth." Mrs. Clifton's son, appellant Ernest J. Clifton, who lives in her home, stated that noise from the trucks awakens him frequently.

Appellants Marie and Edward Mezewski testified at their depositions that a "foggy mist" from the Facility has enveloped the neighborhood for the last ten to fifteen years. Mrs. Mezewski sent envelopes full of dust balls and soot that she removed from her windows to the Baltimore City "Noise and Pollution Control" department in the late 1970s or early 1980s. One explosion knocked the basement windows out of the Mezewskis' home while Mrs. Mezewski was in the basement.

Appellant Sharon Smith testified at her deposition that she noticed cracks in the walls of her house in 1985. Her husband, appellant Robert Smith, Jr., testified at his deposition that an explosion in 1985 broke every window in the house. Another explosion in 1988 broke several windows. He also stated that the foundation of the house was crumbling, which he attributed to the explosions. A Chrysler he bought in 1988 faded considerably within six months, damage he attributed to air emissions from the Facility.

Appellant Mary Bontempo testified at her deposition that repeated explosions knocked five windows in her house out of alignment so that they would no longer open. She also stated that large cracks developed in the bricks on the outside of her

---

4. Charles S. Hayes is the only plaintiff who alleged personal injury as a result of the Facility's operation.

home and that she had seen mortar knocked out of the cracks as the result of an explosion.

Reverend Paschal Morlino, Vice President and Pastor of the Church, testified at his deposition that explosions and soot caused damage to the Church's stained glass windows. He also alleged that the soot, smoke, and "fluff" emanating from the Facility have caused the Church's buildings to require more extensive and frequent cleaning than would otherwise have been necessary. He stated that explosions have caused damage to the roof, requiring repairs, for which United paid.

Appellant Robert Smith, Sr., testified at his deposition that he heard an explosion in 1992 and "I knew something collapsed, but then I heard all this noise [sic] falling down my chimney." The top four feet of his chimney had collapsed. In 1993, an explosion at the Facility shattered his sliding glass door and knocked down his chandelier.

Appellants produced evidence of about thirty notices of violation issued to United by Baltimore City and the Maryland Department of the Environment ("MDE") for excessive noise, vibrations, "fluff" discharge, and other visible air emissions between March 1973 and October 1990. On July 8, 1975 and again on April 3, 1979, the Baltimore City Health Department ordered United to shut down the auto shredder and install air pollution control equipment before reopening. There was evidence that the shredder was shut down briefly in September 1975 when pollution control equipment was installed. There is no evidence in the record that the Facility shut down as ordered in April 1979.

On October 1, 1990, United sold the business to appellee Joseph. Joseph began shredding approximately 100,000 cars per year. Between November 1990 and November 1992, more than thirty notices of violation were issued to Joseph by Baltimore City and MDE for noise violations, vibrations, and visible emissions. In March of 1993, Joseph entered into a Consent Order with MDE. The Consent Order set forth a plan that would bring Joseph into compliance with state air pollution laws. Joseph agreed, among other things, to install

a wet shredder, which would eliminate air and water emissions and help "dampen" the effects of sporadic explosions.

The "Hoffman plaintiffs" [5] originally filed suit on February 8, 1993. The "Roesch plaintiffs" [6] originally filed suit on April 14, 1994. These actions were consolidated. United filed motions for summary judgment, which Joseph joined, against Dianne and Donald Hoffman, Clara B. Mullins, Janet I. Greenhalgh, Charles S. Hayes, Alice Clifton, Ernest J. Clifton, Marie and Edward Mezewski, Sharon and Robert Smith, Jr., Mary Bontempo, and the Church, all of whom were Hoffman plaintiffs. Movants did not file for summary judgment against all the Hoffman plaintiffs or against any of the Roesch plaintiffs. At the hearing on the motions on January 13, 1995, the motions judge indicated he would consider the same arguments made in the summary judgment motions applicable to the Roesch plaintiffs.[7] The motions judge granted summary judgment against all plaintiffs on March 1, 1995.

---

5. The Hoffman plaintiffs are Dianne and Donald Hoffman, their minor children (Heather and Donald Hoffman, Jr.); Clara B. Mullins; Janet I. Greenhalgh; Charles S. Hayes and his minor child (Charles Hayes, Jr.); Ernest J. Clifton; Alice Clifton; Marie and Edward Mezewski, all of whom filed suit on February 8, 1993; Sharon and Robert Smith, Jr., their minor children (John, Heather, Ruth and Robert Smith III); Mary Bontempo and her minor child (Ernest C. Clifton), who joined as plaintiffs on October 13, 1993; and The Benedictine Society of Baltimore City, which joined as a plaintiff on February 23, 1994.

6. The Roesch plaintiffs are Agnes and Vivian Roesch; Earl K. and Maryann Jarrett, and their minor children (Kevin C. Hahn and Jennifer A. Jarrett); Dorothy and Robert Smith, Sr., all of whom filed suit on April 14, 1994; Lewis Wills, Sr. and his minor child (Lewis Wills, Jr.), who joined as plaintiffs on August 22, 1994; Shirley Davis; Eugene P. and Catherine M. Melcavage, who joined on November 7, 1994; Joan D. Brendel; Brenda Brendel and her minor child (Anthony Eckles), who joined on November 25, 1994; and Elvia Melgar, who joined on January 19, 1995.

7. The motions judge stated at the hearing, "I'm going to assume and I think for everybody's purpose that all the motions that have been argued here would be applicable to the [Roesch plaintiffs] and that progeny...." The attorney for United responded, "[W]e would file the same motion [against those plaintiffs]." Plaintiffs, subsequent to the summary judgment hearing, filed a motion to supplement the record, which contained information about how long the Roesch and Hoffman

## STANDARD OF REVIEW

Summary judgment may be granted only when the moving party clearly demonstrates that there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law. *Fearnow v. Chesapeake & Potomac Tele. Co. of Maryland,* 104 Md.App. 1, 48, 655 A.2d 1, *cert. granted,* 339 Md. 445, 663 A.2d 1271 (1995). Summary judgment is inappropriate where there is evidence upon which a jury could reasonably find for the non-moving party. *Beatty v. Trailmaster Prods., Inc.,* 330 Md. 726, 739, 625 A.2d 1005 (1993). The "mere existence of a scintilla of evidence" in support of the non-moving party's claim, however, is insufficient to preclude the grant of summary judgment. *Id.* at 738, 625 A.2d 1005. In reviewing a lower court's ruling on a motion for summary judgment, this Court simply considers whether the lower court was "legally correct." *Southland Corp. v. Griffith,* 332 Md. 704, 712, 633 A.2d 84 (1993). The lower court's legal determinations are not entitled to a presumption of correctness; this Court must apply the law as it understands the law to be. *Rohrbaugh v. Estate of Stern,* 305 Md. 443, 446 n. 2, 505 A.2d 113 (1986). This Court will not ordinarily affirm the granting of summary judgment for a reason not relied upon by the trial judge. *Warner v. German,* 100 Md.App. 512, 517, 642 A.2d 239 (1994). *See also Geisz v. Greater Baltimore Medical Center,* 313 Md. 301, 314 n. 5, 545 A.2d 658 (1988)

---

plaintiffs had lived in the neighborhood and the birth dates of all minor plaintiffs in both the Hoffman and Roesch complaints.

Thus, although never explicitly stated, the appellants implicitly agreed to the motions judge considering summary judgment against all plaintiffs, not just the ones against whom appellees had actually filed a motion. There was no error in the motions judge's action. *See Hunt v. Montgomery County,* 248 Md. 403, 411, 237 A.2d 35 (1968) ("Even though no formal motion for summary judgment under the rules was made, there was before the court enough to justify its action in granting a summary declaratory judgment."); *cf. Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.,* 335 Md. 135, 146, 642 A.2d 219 (1994) (stating that summary judgment rule does not contemplate a court acting entirely on its own motion where none of the parties has moved for summary judgment). Further, appellants do not appeal or even mention the fact that summary judgment was granted as to some of the plaintiffs without a formal request.

("[T]he appellate court will not ordinarily undertake to sustain the judgment by ruling on another ground, not ruled upon by the trial court, if the alternative ground is one as to which the trial court had a discretion to deny summary judgment.").

## I.

Appellants filed complaints asserting that the operation of the Facility constituted at least four different types of nuisances: lead contamination of the appellants' property, periodic explosions, emissions of air pollutants such as smoke and "fluff," and excessive noise. "[W]here a trade or business as carried on interferes with the reasonable and comfortable enjoyment by another of his property, a wrong is done to a neighboring owner for which an action lies." *Meadowbrook Swimming Club, Inc. v. Albert,* 173 Md. 641, 645, 197 A. 146 (1938). "Virtually any disturbance of the enjoyment of the property may amount to a nuisance so long as the interference is substantial and unreasonable and such as would be offensive or inconvenient to the normal person." *Washington Suburban Sanitary Comm'n v. CAE–Link Corp.,* 330 Md. 115, 125, 622 A.2d 745, *cert. denied,* —— U.S. ——, 114 S.Ct. 288, 126 L.Ed.2d 238 (1993). A nuisance action may be brought by a landowner, *see Smith v. Shiebeck,* 180 Md. 412, 421, 24 A.2d 795 (1942), but ownership is not necessary. Lawful possession is sufficient. *See Green v. T.A. Shoemaker & Co.,* 111 Md. 69, 76, 73 A. 688 (1909) (holding that lawful occupant of premises may maintain an action in nuisance). *Accord Vicksburg Chemical Co. v. Thornell,* 355 So.2d 299, 301 (Miss.1978) (stating that a person who has property interest may bring nuisance suit on behalf of himself and all members of his family); *Bowers v. Westvaco Corp.,* 244 Va. 139, 419 S.E.2d 661, 668 (1992) (finding that children, as lawful occupants of land, may recover in nuisance); RESTATEMENT (2D) OF TORTS § 821E cmt. d (1977) (stating that family members may sue in nuisance because "occupancy is a sufficient interest in itself to permit recovery for invasions of the interest in the use and enjoyment of the land"); *contra Conlon v. Town of Farmington,* 29 Conn.Supp. 230, 280 A.2d 896 (1971) (finding that

children could not sue in nuisance because they were not owners of interest in property affected). The minor cannot sue unless he or she has a right to occupy the land. This right is based on the parents' lawful occupancy of the land. If the parent has no right to sue, neither does the minor. Thus, in this case the nuisance action on behalf of the minors is derivative of the nuisance action filed by their parents.

The motions judge found that appellees' operation of the Facility for more than twenty years "constituted a nuisance for the prescriptive period," which he termed a prescriptive easement. The right acquired by appellees is more accurately called a "prescriptive right to maintain a nuisance."

> While the owner of land is entitled to have the air diffused over his land free from pollution by any use made of neighboring land, ... an infringement of which constitutes a nuisance, the owner of the neighboring land may acquire, by ... prescription, an easement consisting of the right to make such injurious use of his land, or, as it is sometimes said, he may acquire a right to maintain a nuisance involving the pollution of air.

3 HERBERT T. TIFFANY, THE LAW OF REAL PROPERTY, § 763 (3d ed. 1939) (footnotes omitted).

▮▮▮▮ An easement is a nonpossessory interest in the real property of another. *Boucher v. Boyer*, 301 Md. 679, 688, 484 A.2d 630 (1984). A prescriptive easement arises when a party has made "an adverse, exclusive and uninterrupted use of [another's land] for twenty years." *Furman E. Hendrix, Inc. v. Hanna*, 250 Md. 443, 445, 243 A.2d 600 (1968); *accord Goldstein v. Potomac Elec. Power Co.*, 285 Md. 673, 677 n. 1, 404 A.2d 1064 (1979) ("To acquire by prescription the right to maintain a private nuisance, the user must continue the nuisance for an uninterrupted period of twenty years.") (citing *Susquehanna Fertilizer Co. v. Malone*, 73 Md. 268, 20 A. 900 (1890)).

▮▮▮▮ Appellees conceded at oral argument that the prescriptive period started when the automobile shredder was

installed and began operation on May 1, 1971.[8] Therefore, appellees must have continued the nuisance uninterrupted until May 1, 1991 to acquire a prescriptive right to maintain it. Appellants contend the appellees failed to meet their burden of proving adverse, exclusive, and uninterrupted use for the prescriptive period.[9] We disagree.

---

8. "[W]hen an easement has been acquired by prescription, the character and extent of the use permissible are commensurate with and determined by the character and extent of the use during the prescriptive period." *Bishields v. Campbell,* 200 Md. 622, 625, 91 A.2d 922 (1952); *see also Kiler v. Beam,* 74 Md.App. 636, 640, 539 A.2d 1138 (1988) ("the type of usage may not be increased just because the use has ripened into a prescriptive right"); *Cook Indus., Inc. v. Carlson,* 334 F.Supp. 809, 818 (N.D.Miss.1971) ("To acquire the right to maintain a private nuisance by prescription, the nuisance must have been maintained in substantially the same manner and with equally injurious results throughout the entire prescriptive period; if the nuisance is of progressive character, there can be no acquisition of prescriptive right."). Thus, activity at the facility prior to 1971, which was of a different character than what occurred once the automobile shredder went into use, would not be part of the prescriptive period.

9. Appellants also contend that the Facility constitutes a public nuisance, which no party may acquire a prescriptive right to maintain. *See Woodyear v. Schaefer,* 57 Md. 1, 8 (1881). A public nuisance is a criminal offense, *Rosenblatt v. Exxon Co., U.S.A.,* 335 Md. 58, 79 n. 8, 642 A.2d 180 (1994). A private person may seek an injunction against one, however, if he owns property injured by the nuisance, *Shiebeck, supra,* 180 Md. at 421, 24 A.2d 795, and "has suffered from it some special and particular damage, different not merely in degree, but different in kind, from that experienced in common with other citizens." *Baltimore & O. R.R. Co. v. Gilmor,* 125 Md. 610, 617, 94 A. 200 (1915).

Although it might well be that the Facility constitutes a public nuisance, we need not decide this issue because it was not raised below. Md. Rule 8–131(a). Furthermore, appellants do not brief the issue; they merely state in their initial brief that the trial court "erred in holding that an entity is empowered to acquire an easement to conduct a public nuisance. . . . No party may acquire an easement to commit a public nuisance." Appellants provide no explanation as to why we should consider the Facility a public nuisance, therefore failing to comply with Maryland Rule 8–504(a)(5), which requires a party to present argument in support of its position. *See Beck v. Mangels,* 100 Md.App. 144, 149, 640 A.2d 236, *cert. granted,* 336 Md. 405, 648 A.2d 991 (1994), *cert. dismissed as improvidently granted,* 337 Md. 580, 655 A.2d 370 (1995). Appellants treat the issue more fully in their reply brief; however, this Court will not consider a question that is briefed

■ To be adverse, the use must be without permission or license. *Clayton v. Jensen,* 240 Md. 337, 343, 214 A.2d 154 (1965). An adverse use is "use of . . . the lands of another whenever one sees fit, and without asking leave, . . . and the burden is upon the owner of the land, to show that the use of the way was by license or contract inconsistent with a claim of right." *Cox v. Forrest,* 60 Md. 74, 79–80 (1883). The use by appellees was clearly adverse to the rights of appellants, and appellants did not present any evidence showing that appellees had a license or contract to make use of the land.

■ The exclusive requirement merely means "the claim of user must not depend on the claim of someone else." *Shuggars v. Brake,* 248 Md. 38, 45, 234 A.2d 752 (1967). "Even though a claimant may not have been the only user, it is sufficient if he used the way under a claim of right independently of others." *Id.*

Appellants contend that their continued use of their own land prevents appellees' use from being exclusive.[10] This is incorrect. "By *exclusive,* the law does not mean that the right of way must be used by one person only, . . . but simply that the right should not depend for its enjoyment upon a similar right in others. . . . It must be *exclusive* as against the right of the community at large." *Cox, supra,* 60 Md. at 80.

■ Finally, to be uninterrupted, the claimant must exercise

---

for the first time in a reply brief. Md. Rule 8–131; *Rose v. Paape,* 221 Md. 369, 157 A.2d 618 (1960).

**10.** Appellants do not assert that the brief shutdown of the shredder in September 1975, and the repeated shutdowns of the shredder for repairs immediately after large explosions, constitute an interruption. We note, in any event, that such an argument would be unpersuasive. *See, e.g., Shuggars, supra,* 248 Md. at 46, 234 A.2d 752 (holding that nine-year interruption of use of right of way does not toll the statute of limitations; a prescriptive "easement may not be lost unless there is some act clearly and unequivocally indicating an intention to abandon it, and mere non-user is not enough").

the right more or less frequently, according to the nature of the use to which its enjoyment may be applied, and without objection on the part of the owner of the land, and under such circumstances as excludes the presumption of a voluntary abandonment on the part of the person claiming it. *Id. Cox, supra,* 60 Md. at 80.

Appellants contend that appellees' use was not uninterrupted because of the many complaints and objections they, other neighbors, and government officials lodged over the years. Mere complaints, however, will not prevent the acquisition of a right by prescription without an abandonment or interruption in the use.

Appellants contend that each appellee must operate the nuisance for twenty years before it can acquire a prescriptive right to maintain it. Successive ownership of the dominant estate, however, may be tacked if there is privity. *See Clayton, supra,* 240 Md. at 344, 214 A.2d 154. United sold only the operation of the Facility to Joseph in 1990, retaining ownership of the land. The easement continued to benefit the land owned by United, and there is privity between Joseph, which continued the nuisance, and United, its predecessor.

Appellants further contend that the motions judge erred by applying the same rule of tacking to the owners of the land burdened by the easement as applied to the adverse users. *Clayton,* as noted above, deals with tacking by adverse users, not by servient estate owners. There is no case law in Maryland dealing with whether a change in ownership of the servient estate begins the prescriptive period anew. This Court has noted, however, that "treatises and the overwhelming majority of case law in other jurisdictions agree that 'an easement is not binding on a subsequent bona fide purchaser of the servient estate if he purchases without notice, either actual or constructive, of the easement.'" *Kiler v. Beam,* 74 Md.App. 636, 641, 539 A.2d 1138 (1988). It is axiomatic that no plaintiff could have had notice of any easement until the easement actually existed. *Kiler* stands for the proposition that an *existing* easement may be extinguished by a subse-

quent purchase of the property. *See also Rogers v. Burnopp,* 263 Md. 357, 283 A.2d 367 (1971) (change in ownership of servient estate did not affect prescriptive easement when right of way was visible for more than twenty years). It does not address the issue of whether a change in ownership of the servient estate affects the prescriptive period.

The policy behind the acquisition of property rights by prescription is that "[i]t is better, says the law, that the negligent owner who has omitted to assert his right within the time prescribed by the statute, should lose his rights than one should be disturbed in his possession, and harassed by stale demands . . . ." *Hanson v. Johnson,* 62 Md. 25, 31 (1884). This Court stated in *Kiler,* quoting West Virginia's highest appellate court:

> "The grantee is bound where a reasonably careful inspection of the premises would disclose the existence of the easement, or where the grantee has knowledge of facts sufficient to put a prudent buyer on inquiry. It is not necessary that the easement be in constant and uninterrupted use. The purchaser of property may assume that no easements are attached to the property purchased which are not of record except those which are open and visible."

74 Md.App. at 642, 539 A.2d 1138 (quoting *Fanti v. Welsh,* 152 W.Va. 233, 161 S.E.2d 501, 505 (1968)). It is logical to conclude that, because prescriptive rights are designed to disadvantage those who sleep on their rights, the prescriptive period did not begin to run against the adult plaintiffs until they had notice, either actual or constructive, of the nuisance.[11]

---

**11.** Additional support for this conclusion can be drawn from the fact that Maryland does not recognize the defense of "coming to the nuisance," giving plaintiffs a right to complain about a nuisance that existed before they bought land near it. *Susquehanna Fertilizer Co., supra,* 73 Md. at 281. This support is weak, however, as the *Susquehanna Fertilizer* Court, after holding that Maryland does not recognize a coming to the nuisance defense, went on to state, "If the appellant had acquired a prescriptive right, that is to say, a user of the place for twenty years, that would present a different question." *Id.*

██ Appellees presented no evidence at the motions hearing as to when the Roesch plaintiffs knew about the explosions and air emissions coming from the Facility. Likewise, they failed to show when some of the Hoffman plaintiffs knew about the explosions and emissions. Therefore, it was improper for the motions judge to grant summary judgment against all plaintiffs, because appellees failed to demonstrate clearly that there was no genuine dispute as to when each plaintiff found out about the nuisance.

 Finally, appellants contend that a party may not obtain a prescriptive easement to perform an illegal act,[12] relying on an out-of-state case.[13] The Supreme Court of Mississippi held that the enactment of a state pollution law "tolled any prescriptive right gained by [defendant] or its predecessor in ownership." *Vicksburg Chemical Co., supra,* 355 So.2d at 301. Appellants argue that, when Maryland enacted the regulations cited in note 12, *supra,* in 1980, it became impossible for the appellees to obtain a prescriptive right to maintain a nuisance. We reject appellants' argument. Just as the legality of a business is not conclusive as to whether its operation constitutes a nuisance, *Stottlemyer v. Crampton,* 235 Md. 138, 200 A.2d 644 (1964), illegality of certain conduct is not conclusive as to the same question. We see no reason to hold that the passage of regulations controlling air pollution in 1980 tolled the prescriptive period. *See Booth Glass Co., Inc. v. Huntingfield Corp.,* 304 Md. 615, 500 A.2d 641 (1985) (holding that where legislature has not ex-

---

**12.** Appellants cite two regulations that they allege the Facility violates. *See* COMAR 26.11.06.08 (stating that premises "may not be operated or maintained in such a manner that a nuisance or air pollution is created"); COMAR 26.11.06.02C (regulating visible emission standards).

**13.** Appellants also point to the Supreme Court of Oregon, which held that "no prescriptive right to pollute against a private landowner can be acquired if such pollution is also a public nuisance." *Smejkal v. Empire Lite–Rock, Inc.,* 274 Or. 571, 547 P.2d 1363, 1368 (1976). This is analogous to Maryland law. As stated in note 9, *supra,* however, we are using a private nuisance theory in this case because appellants never called it a public nuisance below.

pressly provided for exception in statute of limitations, court will not allow any implied equitable exception to be grafted upon it).

Appellees have carried their burden in proving that they have acquired a prescriptive right to maintain a nuisance as to some appellants. They were not entitled, however, to summary judgment against every appellant for all four types of nuisance. There is no dispute that the Facility began operating its automobile shredder on May 1, 1971 and that at least 250 explosions occurred between January 3, 1972 and November 24, 1994, causing damage to many of appellants' homes. The shredder caused air emissions in the form of smoke and "fluff" to fall upon appellants' property. Similarly, the excessive noise complained of by appellants has continued at least as long as the shredder has been operating. There is no evidence in the record, however, that the lead contamination has existed for more than twenty years. In 1987, a dust sample taken from the top of a car parked on the street near the Facility showed high lead levels, but it was not until July 1994 that tests of soil revealed high lead levels in the backyards of plaintiffs' houses bordering on the Facility. Summary judgment should not have been granted against any appellant on the issue of the lead contamination because appellees, as the moving party, did not clearly demonstrate that they had acquired a prescriptive easement to continue the lead emissions by adverse, exclusive and uninterrupted emission for the twenty-year period.

We affirm the granting of summary judgment against any plaintiff who has owned or lived in Mill Hill for a continuous twenty-year period before filing suit on the nuisance count for the other three types of nuisances alleged.[14] *Kluckhuhn v.*

---

14. The granting of summary judgment on the nuisance claim is affirmed as to the following plaintiffs: Janet I. Greenhalgh, who bought her home in 1969; Alice Clifton, who bought her home in 1937, and her adult son Ernest J. Clifton; Marie and Edward Mezewski, who inherited their home in 1969; The Church, which has owned land in the neighborhood since 1893; Agnes Roesch, who bought her home in 1930; Eugene P. and Catherine M. Melcavage, who bought their home

*Ivy Hill Ass'n, Inc.,* 55 Md.App. 41, 48, 461 A.2d 16 (1983) (filing of suit tolls the statute), *aff'd,* 298 Md. 695, 472 A.2d 77 (1984). We also affirm the grant of summary judgment on the nuisance count against the minor child Lewis Wills, Jr., for the remaining three types of nuisance even though he has not lived in the neighborhood for twenty consecutive years, because his cause of action is derivative of his father's. With the exception of Lewis Wills, Jr., we shall reverse the granting of summary judgment against any plaintiff who has not owned or resided in Mill Hill for a continuous twenty-year period before filing suit. We shall also reverse the granting of summary judgment on the nuisance count against any plaintiff about whom appellees did not introduce any evidence indicating when they had notice of the easement.[15]

Appellants also filed claims for trespass,[16] strict liability, and negligence. Appellees argue that their acquisition of a prescriptive right to maintain a nuisance gives them a "privilege" to operate that precludes legal action for any torts arising out of those operations. "Adverse use for the prescriptive period results in an immunity on the part of the user

---

in 1960; Lewis Wills, Sr., who bought in the summer of 1973 and did not file suit until August 1994.

15. The granting of summary judgment is reversed on the nuisance count as to the following plaintiffs who had not owned property or resided in the neighborhood for 20 years prior to filing suit: Clara B. Mullins; Sharon and Robert Smith, Jr., and their minor children (John Smith, Robert Smith III, Heather Smith and Ruth Smith); Mary Bontempo and her minor child (Ernest C. Clifton); Earl and Maryann Jarrett, and their minor children (Kevin C. Hahn and Jennifer Jarrett); Dorothy and Robert Smith, Sr.; Elvia Melgar. The granting of summary judgment is reversed as to the following plaintiffs because appellees did not prove that they had owned or resided in the neighborhood for 20 years before filing suit: Donald and Dianne Hoffman and their minor children (Heather Hoffman and Donald Hoffman, Jr.); Shirley Davis; Vivian Roesch; Joan D. Brendel. We also reverse as to Brenda Brendel and her minor child (Anthony Eckles), and Charles S. Hayes and his minor child (Charles Hayes, Jr.), because appellees produced no evidence showing these plaintiffs knew about the easement.

16. The trespass count was limited to the lead contamination.

from liability for his acts of use during the prescriptive period." RESTATEMENT (FIRST) OF PROPERTY § 465 (1944).

> Until the last moment of the prescriptive period, the acts of adverse use are generating new causes of action. For those immediately preceding the running of the prescriptive period, the statutory period cannot have run. Nevertheless, upon the running of the prescriptive period and the consequent creation by prescription of an easement, all acts of adverse use contributing to the creation by prescription of such easement become privileged retroactively. Even though the statute of limitations has not run on the causes of action created by them, they become privileged under the easement to the creation of which they have contributed.

RESTATEMENT (FIRST) OF PROPERTY § 465 cmt. a (1944). For example, the holder of an easement can not be considered a trespasser because he or she has a nonpossessory right to use land. *See Boucher, supra,* 301 Md. at 688, 484 A.2d 630. Maryland law comports with the Restatement. *Cf. Bishields v. Campbell,* 200 Md. 622, 625, 91 A.2d 922 (1952) (holding that character and extent of permissible use of prescriptive easement are commensurate with character and extent of use during prescriptive period). *Accord* RESTATEMENT (2D) OF TORTS § 188 (1965) ("[o]ne who has an easement over . . . land is privileged to enter the land"). Other states follow the logic of the Restatement without citing to it. *See Big Cottonwood Tanner Ditch Co. v. Moyle,* 109 Utah 213, 174 P.2d 148, 158 (1946) (holding that the burdens that the servient owner may enjoin are those that are "over and above those embraced within the framework of the easement itself"). We adopt RESTATEMENT (FIRST) OF PROPERTY § 465 as Maryland law. Thus, appellees would not be liable for any tortious use that occurred during the prescriptive period against any plaintiff against whom appellees have acquired a prescriptive easement. Any such tortious use subsequent to the acquisition of the prescriptive easement is also privileged as long as they are of the same type of acts common to the nuisance for which appellees have gained their prescriptive right. *See Nagel v. Emmons County Water Resource Dist.,* 474 N.W.2d 46, 50

(N.D.1991) (citing RESTATEMENT (FIRST) OF PROPERTY § 465 in holding that plaintiff had no rights upon which to maintain cause of action for flooding on his land because he did not file suit until twenty-four years after adverse use began, including flooding occurring in years after county had acquired easement).

We note also that the acts of adverse use that become privileged are only those acts that affect property, not any acts of adverse use causing physical injury, because nuisance is a tort against the use and possession of property, as opposed to a tort against the person. *See* FOWLER V. HARPER ET AL., THE LAW OF TORTS § 1.23 (2d ed. 1986).

The granting of summary judgment as to Count III (Nuisance) is reversed as to all plaintiffs on the issue of the lead contamination as a nuisance; reversed as to the plaintiffs listed in note 15, *supra,* on the issue of explosions, excessive noise, and air emissions as nuisances; affirmed as to Lewis Wills, Jr. and the plaintiffs listed in note 14, *supra,* on the issue of explosions, excessive noise, and air emissions as nuisances.

## II.

The motions court found that the Facility was operating a permanent nuisance; therefore, appellants' nuisance claims were barred by the statute of limitations. Appellants argue that the nuisance is a temporary one.[17]

"The difference between a 'permanent' and a 'temporary' nuisance is that a temporary one can be abated, while a permanent nuisance will be presumed by its character and circumstances to continue indefinitely." *Moy v. Bell,* 46 Md. App. 364, 371, 416 A.2d 289 (1980). The clearest case of a permanent nuisance is one in which the offending condition is

---

17. This argument, if successful, would primarily affect those appellees who survived summary judgment on all nuisance claims under Part I. *See, supra,* note 15. The appellants against whom we affirmed summary judgment on Part I would potentially be affected only in regard to their lead nuisance claim. *See, supra,* note 14.

maintained as a necessary part of the operation of a public utility because such conditions are usually of indefinite duration. *See, e.g., Goldstein, supra,* 285 Md. at 689, 404 A.2d 1064; **HARPER,** *supra,* § 1.30 at 121–22. "Recognizing, however, that any nuisance man creates, man can abate, it seems clear that the question being considered in *Goldstein* is not the *possibility* of abatement but rather its *likelihood.*" *Moy, supra,* 46 Md.App. at 371, 416 A.2d 289 (emphasis added).

A suit for damages as a result of a permanent nuisance must be brought within three years of the time that the permanency of the condition becomes manifest to a reasonably prudent person. *Goldstein, supra,* 285 Md. at 689, 404 A.2d 1064. This is so because of the assumptions "that the nuisance will continue into the indefinite future, that it will continue to cause injury to the land, and that the only appropriate measure of damages is permanent reduction in the market value of the property resulting from the nuisance." *Id.* at 682, 404 A.2d 1064. Thus, damages for the permanent diminution in the market value of the land caused by a nuisance may only be recovered if the nuisance is deemed permanent. *See Goldstein, supra,* 285 Md. at 682, 404 A.2d 1064; *Carroll Springs Co. v. Schnepfe,* 111 Md. 420, 74 A. 828 (1909). Plaintiffs must sue for past, present, and prospective damages all at once because there is only one cause of action for a permanent nuisance. *See* **HARPER,** *supra,* § 1.30 at 121.

On the other hand, each day's continuance of a temporary nuisance creates a new cause of action. *See Goldstein, supra,* 285 Md. at 682, 404 A.2d 1064. Therefore, "successive actions may be brought for damages for each invasion of the plaintiff's land until the period of prescription has elapsed, but recovery may only be had for damages actually sustained, other than permanent reduction in the market value of the property, within three years of the filing of the action." *Id.* at 690 n. 4, 404 A.2d 1064.

We believe that the motions judge erred in finding that the Facility was a permanent nuisance because there was a genuine dispute as to whether the nuisance was abatable.

In March 1993, Joseph entered into a Consent Order with the MDE, setting forth a plan that would bring Joseph into compliance with state air pollution laws. Joseph agreed, among other things, to install a wet shredder that would eliminate air and water emissions and help alleviate the effects of sporadic explosions. We find that this is evidence upon which a jury could reasonably find that the nuisance was abatable.

In *Goldstein*, the Court of Appeals assumed that the nuisance under scrutiny was a permanent one because that was the posture of the question as certified to it by the United States Court of Appeals for the Fourth Circuit. *See id.* at 683, 404 A.2d 1064. The Maryland Court of Appeals, however, disputed this characterization because Pepco, the defendant, had entered into a consent decree with the Maryland Department of Health and Mental Hygiene whereby Pepco agreed to operate its facility in full compliance with Maryland air pollution requirements. *Id.* The Court stated, "Thus, the nuisance here alleged may not be of permanent duration, but may be abated." *Id.* The Court also pointed out that the nuisance alleged was subject to abatement through the injunctive process by the Department of Health and Mental Hygiene and the Public Service Commission. *Id.* All of this is true in the case *sub judice.* Further, the availability of technology, such as the wet shredder, which reduces the number of explosions, "demonstrates that the operation can be changed at reasonable expense to avoid the nuisance." *Beatty v. Washington Metro. Area Transit Auth.,* 860 F.2d 1117, 1123 (D.C.Cir. 1988).

Appellee United argues that, because it sold the operation to Joseph on October 1, 1990, any plaintiff who filed suit after October 1, 1993 may not maintain a suit against it due to the statute of limitations. We need not address this issue because the motions judge did not rely on it in making his decision.[18]

---

**18.** Appellants argued below that United had continuing liability after it sold the Facility to Joseph because it entered into a consulting contract

*See Boyer v. State,* 323 Md. 558, 588, 594 A.2d 121 (1991); *Geisz, supra,* 313 Md. at 314 n. 5, 545 A.2d 658; *Warner, supra,* 100 Md.App. at 517, 642 A.2d 239.

### III.

Appellants alleged they were entitled to punitive damages for all four theories under which they filed suit. Their complaint alleged causes of action for both intentional (trespass) and non-intentional (strict liability, nuisance, and negligence) torts.

"In a non-intentional tort action, the trier of facts may not award punitive damages unless the plaintiff has established that the defendant's conduct was characterized by evil motive, intent to injure, ill will, or fraud, *i.e.,* 'actual malice.' " *Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, 460, 601 A.2d 633 (1992).

> "[T]o entitle one to [punitive] damages there must be an element of fraud, or malice, or evil intent . . . entering into and forming part of the wrongful act. It is in such cases as these that exemplary or punitive damages are awarded as a punishment for the evil motive or intent with which the act is done, and as an example or warning to others."

*Id.* at 455, 601 A.2d 633 (quoting *Philadelphia, W. & B. R.R. Co. v. Hoeflich,* 62 Md. 300, 307 (1884)). Even in an intentional tort context, actual malice must exist in order for punitive damages to be awarded. *Schaefer v. Miller,* 322 Md. 297, 319–20, 587 A.2d 491 (1991); *Fairfax Savings, F.S.B. v. Ellerin,* 94 Md.App. 685, 709–10, 619 A.2d 141 (1993), *vacated on other grounds,* 337 Md. 216, 652 A.2d 1117 (1995).

"[I]n *any* tort case a plaintiff must establish by clear and convincing evidence the basis for an award of punitive damages." *ACandS, Inc. v. Godwin,* 340 Md. 334, 361 n. 6, 667 A.2d 116 (1995). To meet this burden, the plaintiff must persuade the trier of fact that "the truth of the contention is

---

with Joseph, citing **Restatement (Second) of Torts** § 324 (1965) ("Liability to Third Person for Negligent Performance of Undertaking").

not merely probable, but that it is 'highly probable.' " *Id.* at 374 n. 11, 667 A.2d 116.

[38] Appellants argue that they presented proof, in their opposition to the summary judgment motion, that appellees' conduct was characterized by actual malice. Appellants' proffered evidence, however, failed to show malice. Appellants introduced a complaint form filled out by the Department of Public Works, dated December 6, 1950, which indicated that a Mrs. Duff of 2614 Cole Street, not a plaintiff in this case, called the department to say that heavy smoke and soot from the Facility was dirtying her clothes that were hung outside to dry. Someone named Reizenstein at the department "[p]honed Mr. I.D. Shapiro, son of the owner [of United Iron], who said he would investigate this operation and stop the smoke." Appellants characterize this "false promise to stop the pollution" as fraud. Mr. Shapiro's words do not amount to fraud because there is no evidence that the statement was made with the intent that the plaintiffs rely on the "promise" to stop the smoke or that any of the plaintiffs actually relied on it. Further, this occurred twenty-one years before the installation of the shredder, the source of the problem about which these appellants now complain.

Appellants also proffered evidence that United knew the explosions were damaging neighboring homes and knew the Facility was producing dust and soot that blanketed the neighborhood. Such knowledge does not show, however, evil motive, ill will, intent to injure, or fraud. At most, it amounts to gross negligence, which is insufficient to show actual malice. *See Godwin, supra,* 340 Md. at 361, 667 A.2d 116 (" 'negligence alone, no matter how gross, wanton, or outrageous, will not satisfy [the] standard' " of actual malice (quoting *Zenobia, supra,* 325 Md. at 463, 601 A.2d 633)).

Appellants also contend that United did not ever consider shutting down the Facility because, as Mr. Shapiro stated at his deposition, it "wouldn't make economic sense just to close it down," asserting this shows actual malice. Proof that a party acted to pursue his or her own selfish business

interests at the expense of others is not, in itself, sufficient proof of actual malice. *See Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 336 Md. 635, 653–54, 650 A.2d 260 (1994) (stating that Maryland "has long recognized that self-interested commercial dealing has its proper place in the business world").

Additionally, appellants contend that an April 23, 1992 memorandum written by David Workum, Joseph's general manager, was proof of Joseph's actual malice. The memo read, in pertinent part:

When we have an explosion, it will be Joe LiPira's responsibility to contact Joe Ray at the Maryland Department of the Environment to notify him of the occurrence.

Give him the basics, do not give him the details with regards to the severity of the explosion.

If, however, it is a severe explosion, where severe damage has occurred to the mill, and potential damage could have occurred in the neighborhood, make sure you discuss this with me or Dave Nowotarski before making the call. I do not want to alarm the Maryland Department of the Environment, but want only to notify them of the explosion.

This should be done within five minutes of the explosion, and therefore prevent their coming to the yard to inspect.

The memo merely outlines the procedure Joseph employees must follow when an explosion occurs. The memo did not perpetrate, or attempt to perpetrate, a fraud upon the plaintiffs in this case. The memo failed to show it was "highly probable" that Joseph had an evil motive or harbored ill will against the appellants, or that Joseph had an intent to injure them.

Finally, appellants presented no evidence that appellees acted with actual malice in the trespass action, restricted to the lead contamination. Appellants showed that United tested the soil on the Facility's land for lead in 1988 and were notified by tests done on dust found on a car in 1987 that the soot emanating from the Facility might contain lead. There was no proof, however, that either of the tests showed that the

lead emissions were so high as to cause health problems or property damage to those who lived nearby. In sum, appellants' evidence did not show that it was "highly probable" that appellees maliciously continued the lead emission.

We agree with the motions judge that appellants did not show that they were able to meet the clear and convincing standard necessary for a submissible punitive damages claim. It is not highly probable that appellees acted with evil motive, intent to injure, ill will, or fraud. In fact, appellants themselves introduced evidence that showed United and Joseph listened to and made at least some effort to respond to neighborhood concerns. Appellees repaired broken windows, paid for the repair of the Church roof, and attended community meetings discussing problems the neighborhood was having with the Facility.

The motions judge granted summary judgment in favor of appellees because,

> although there is ample evidence that Defendants' conduct has been detrimental to others, the behavior Plaintiffs describe is at most wanton and reckless and does not constitute actual malice as *Zenobia* requires.... Furthermore, *Zenobia* requires that Plaintiffs prove actual malice by clear and convincing evidence which is a burden Plaintiffs have not met.

We agree and affirm this part of the court's ruling.

### *CONCLUSION*

The granting of summary judgment is hereby affirmed as to Counts II, IV, VI, and VIII (Punitive damages) in the Hoffman and Roesch complaints. The granting of summary judgment is reversed as to Count VII (Trespass) in the Hoffman and Roesch complaints.

The granting of summary judgment as to Count III (Nuisance) in the Hoffman and Roesch complaints is reversed as to all plaintiffs on the issue of the lead contamination as a nuisance; reversed as to the plaintiffs listed in note 15, *supra,* on the issue of explosions, excessive noise, and air emissions as

nuisances; affirmed as to Lewis Wills, Jr. and the plaintiffs listed in note 14, *supra*, on the issue of explosions, excessive noise, and air emissions as nuisances.

The granting of summary judgment as to Counts I (Negligence) and V (Strict Liability) is affirmed as to the plaintiffs listed *supra* in note 14 and reversed as to Lewis Wills, Jr. and the plaintiffs listed *supra* in note 15.

**JUDGMENTS ENTERED AGAINST JANET I. GREENHALGH, ALICE CLIFTON, ERNEST J. CLIFTON, MARIE AND EDWARD MEZEWSKI, THE BENEDICTINE SOCIETY OF BALTIMORE CITY, AGNES ROESCH, EUGENE P. AND CATHERINE M. MELCAVAGE, LEWIS WILLS, SR. AND HIS MINOR CHILD (LEWIS WILLS, JR.) REVERSED AS TO THE PORTION OF COUNT III (NUISANCE) DEALING WITH LEAD CONTAMINATION; AFFIRMED AS TO COUNT I (NEGLIGENCE), THE REMAINING PORTIONS OF COUNT III, AND COUNT V (STRICT LIABILITY);**

**JUDGMENTS ENTERED AGAINST CLARA B. MULLINS, SHARON AND ROBERT SMITH, JR. AND THEIR MINOR CHILDREN (JOHN SMITH; ROBERT SMITH, III; HEATHER SMITH; AND RUTH SMITH), MARY BONTEMPO AND HER MINOR CHILD (ERNEST C. CLIFTON), EARL AND MARYANN JARRETT AND THEIR MINOR CHILDREN (KEVIN C. HAHN AND JENNIFER JARRETT), DOROTHY AND ROBERT SMITH, SR., ELVIA MELGAR, DONALD AND DIANNE HOFFMAN AND THEIR MINOR CHILDREN (HEATHER HOFFMAN AND DONALD HOFFMAN, JR.), SHIRLEY DAVIS, VIVIAN ROESCH, JOAN D. BRENDEL, BRENDA BRENDEL AND HER MINOR CHILD (ANTHONY ECKLES), AND CHARLES S. HAYES AND HIS MINOR CHILD (CHARLES HAYES, JR.), REVERSED AS TO COUNT I, COUNT III, AND COUNT V;**

**JUDGMENTS ENTERED AS TO COUNT VII (TRESPASS) AGAINST ALL PLAINTIFFS REVERSED;**

JUDGMENTS ENTERED AS TO COUNTS II, IV, VI, AND VIII (PUNITIVE DAMAGES) AFFIRMED;

COSTS TO BE PAID ONE–HALF BY APPELLANTS AND ONE–HALF BY APPELLEES.