780 A.2d 359

**PRUDENTIAL SECURITIES INC.**

v.

**E–NET, INC., et al.**

**No. 1312, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

Sept. 5, 2001.

Gilbert W. Boyce (Joseph A. Ingrisano and Kutak Rock, LLP on the brief), Washington, DC, for appellant.

Professor James Steven Rogers, Newton, MA, as amicus curiae.

Beth A. Levene (Bruce R. Genderson, George A. Borden, Lisa M. Duggan and Williams & Connolly LLP, on the brief), Washington, DC, for appellee, E–Net, Inc.

Ralph Drury Martin (Richard S. Kraut, Michael J. Dixon and Dilworth Paxson PLLC on the brief), Washington, DC, for appellee, American Stock Transfer & Trust Co.

Argued before HOLLANDER, KENNEY and ROBERT L. KARWACKI (Ret'd, specially assigned), JJ.

KENNEY, Judge.

Appellant, Prudential Securities, Inc. ("Prudential"), appeals the entry of judgment by the Circuit Court for Montgomery County granting motions to strike the Amended Complaint and motions for summary judgment filed by appellees, e-Net, Inc. ("e-Net") and American Stock Transfer and Trust Co ("AST"). It presents six issues on appeal, which we have rephrased and reordered as follows:

 I. Did the trial court err when it granted summary judgment in favor of appellees on Count I of the Complaint because both § 8–204 of the Uniform Commercial Code and Maryland common law recognize a cause of action for appellees' negligence?

 II. Did the trial court err when it found there were no genuine issues of material fact as to whether appellees' failure to enforce the lockup was the proximate cause of appellant's loss?

III. Did the trial court err in granting summary judgment on the grounds of assumption of the risk because there were issues of material fact as to whether appellant assumed or appreciated the risk that the collateral shares would not bear their required restrictive legends, or would not be subject to a stop transfer order?

IV. Did the trial court err because there were genuine issues of material fact as to whether PSI was contributorily negligent?

V. Did the trial court err in dismissing PSI's claim for negligent misrepresentation because PSI proved all the essential elements of such a cause of action, including misrepresentation by e-Net and AST?

VI. Did the trial court abuse its discretion in granting appellees' motion to strike the Amended Complaint where there was no pending trial date, where appellant diligently amended the Complaint to conform to the facts of the case, and where appellees suffered no prejudice from the amendment?

For the reasons set forth below, we reverse the trial court's ruling striking the amended complaint but affirm its decision granting summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellee e-Net, Inc. is a Delaware corporation with its principal place of business in Germantown, Maryland. It provides a service whereby customers can make telephone calls over the internet. Thomas Prousalis, Jr. acquired 450,-000 shares of e-Net stock in January 1995, apparently in exchange for acting as counsel to e-Net in connection with its formation and initial capitalization. In 1997, e-Net sought to initiate an Initial Public Offering ("IPO") and again enlisted Prousalis's legal services. In connection with the IPO, Prousalis agreed not to sell, transfer, or otherwise dispose of his shares for two years after e-Net's IPO, which was scheduled for April 1997 (the "lockup agreement"). e-Net also engaged

AST as its transfer agent to implement any applicable restrictions and to maintain stop transfer orders on restricted e-Net shares.

From April 1997 to March 1998, Prousalis's shares were evidenced by a single certificate on which AST had affixed two restrictive legends. The first legend reflected a restriction imposed by securities law ("1993 Securities Act" restriction), while the second restriction reflected Prousalis's lockup agreement.[1] This certificate was held in account with Dean Witter Reynolds, Inc. ("Dean Witter"). Prousalis's broker was Mark A. Rodgers, and the account was maintained in Clearwater, Florida.

In March 1998, e-Net authorized AST to remove the 1933 Securities Act restriction from Prousalis's certificate. e-Net also instructed AST to maintain stop transfer orders on all restricted shares, including those of Prousalis. AST thereafter reissued Prousalis's certificates in new denominations, giving him four stock certificates representing 100,000 shares each and one certificate representing 50,000 shares. Rather than excluding only the 1993 Securities Act restriction from the face of the certificate, it excluded the lockup restrictions on the shares as well. In addition, AST failed to indicate within its system that the shares were still subject to the lockup agreement. Prousalis deposited four reissued, unlegended e-Net certificates into his brokerage account with Dean Witter. These certificates represented 400,000 of Prousalis's 450,000 shares in e-Net.

---

1. The two restrictions read as follows:

 The Securities represented by this certificate have not been registered under the Securities Act of 1933. The Securities have been acquired for investment purposes only and may not be sold, transferred or assigned in the absence of an effective registration statement for these shares under the Securities Act of 1933, or an opinion of counsel of the company that registration is not required under said act. [1933 Securities Act restriction.]

 The securities represented by this certificate may not be sold, transferred, assigned or otherwise disposed of prior to April 7, 1999. [Lockup agreement restriction.]

Prousalis then pledged his e-Net shares to Dean Witter in order to open a margin credit account. This pledge required that formal ownership of the shares be transferred from his name to the name of a stock clearinghouse called Depository Trust Company ("DTC").[2] DTC operated a national depository, which allowed stocks, once entered into their system, to be transferred by book entry within their system. In other words, in the event of a transfer, certificates are not exchanged and no formal transfer of ownership was recorded by e-Net or AST. At oral argument, Prudential's attorney explained that shares that come through DST are, by definition, unrestricted. Once Prousalis opened the margin account with Dean Witter, he was able to buy additional shares of unrestricted e-Net stock, giving him a total of 693,200 shares.

In early August 1998, Rodgers left Dean Witter and began working for Prudential. On August 7, 1998, Prousalis opened a margin account with Prudential at its Clearwater branch and instructed Dean Witter to transfer all of his e-Net shares to that account.[3] Dean Witter complied with this request, and the transfer was completed through the DTC system. At the same time, Prousalis sought a loan from Prudential for $5,892,200, which represented 50% of the value of the e-Net shares transferred. The loan would be secured by the e-Net shares owned by Prousalis.

Joseph Luino, Prudential's Senior Vice President of Credit Control Administration, was vested with the authority to decide whether the loan should be made. Concerned that

---

**2.** In its responses to e-Net's first requests for admissions, Dean Witter admitted "that Prousalis's pledge of the 400,000 e-Net shares to Dean Witter required that formal ownership be transferred from his name to Cede & Company, the nominee name of a stock clearinghouse called" DTC.

**3.** It is suggested that Rodgers was displeased with Dean Witter's practice of short-selling stock pledged for margin accounts, and left Dean Witter to affiliate with Prudential. In light of Rodgers move to Prudential, Prousalis and two other of Rodgers's customers holding e-Net shares urgently sought to transfer assets currently held by Dean Witter to Prudential.

there may be some restriction on the saleability of the pledged e-Net shares, Luino contacted Valerie Kerr of Prudential's Executive Services and Strategies ("ESS") department for guidance on the saleability of the stock offered as collateral.

Kerr requested that Prudential's Clearwater branch complete a standard "margin checklist" document in accordance with Prudential's internal operation procedures. The margin checklist requests information about the customer and the shares being offered as collateral and is designed to elicit whether there are any restrictions on the transferability of the shares. It specifically asked whether the shares were subject to any lockup agreement, and if so, when the lockup agreement expired.[4] The Clearwater branch failed to complete the checklist.

Although the margin checklist was never completed and Kerr did not render an opinion on the saleability of the shares, Luino, who stated in a deposition that Kerr advised him the shares were not restricted, extended Prousalis the margin loan on the day it was requested, August 7, 1998. The actual transfer of e-Net shares from Dean Witter to appellant occurred the following Monday, August 10, 1998, through the DTC system. Neither AST nor e-Net was made aware of the transfer. The loan amount was 50% of the market value of Prousalis's e-Net shares, which at the time, were trading at $17 per share. The e-Net shares thereafter increased in market value, reaching a high of $20 per share on August 18,

---

**4.** The margin checklist provided, in part:

1. Amount of Loan Requested: _____
2. Is stock legended? (Y/N) Acquisition Date: _____
3. How was stock acquired? _____
4. Shares subject to lock-up?
 (Y/N) __ Underwriter: _____ Exp. Date: _____
5. Pledged to support a note? (Y/N) Date paid in full _/_/_
6. Garnishments, liens, etc. (Y/N) Released? (Y/N) When? _/_/_
7. Desired Use of Proceeds of Loan? _____
8. Current Commission Income: _____ Is stock marginable? (Y/N)
9. Shelf Registration? (Y/N) Date of Prospectus? _/_/_
10. Sales in Past 3 months? (Y/N) . . .
11. Other significant activity? (Y/N) . . .
12. Shares pledged elsewhere (Y/N) . . .

1998. This high, however, was short-lived and, on September 3, 1998, e-Net's stock closed at $7¾ per share. At this point, Prudential exercised its right to a "margin call" and demanded that Prousalis deposit approximately $3.5 million in additional cash or securities into his margin account pursuant to his margin loan agreement. The margin account agreement required Prousalis to "maintain such margins as [Prudential] may in [its] discretion require from time to time and [to] pay on demand any debit balance."

Prousalis failed to deposit the requested amount into his account, and, on September 4, 1998, Prudential began selling Prousalis's e-Net shares to satisfy the debt. Between September 4, 1998, and September 16, 1998, Prudential sold 243,200 shares of e-Net stock at approximately $4.03 per share. The debt was still not satisfied, and, by April 7, 1999, Prudential sold an additional 235,883 of Prousalis's e-Net shares. By June 24, 1999, Prudential had completed the sale of all of Prousalis's e-Net shares. Prudential claims to have lost approximately $3,500,825.12 on the loan.

On October 5, 1998, Prudential filed suit, asserting:

Count I U.C.C. § 8–204 [5] and negligence, against both e-Net and AST

Count II negligent misrepresentation based on the erroneous removal of the lockup legend on Prousalis's e-Net shares, against e-Net and AST

Count III breach of warranty based on U.C.C. § 8–208, against AST only.

Count III was dismissed on February 12, 1999, pursuant to a motion to dismiss filed by AST.[6] e-Net and AST filed cross-

---

**5.** Md.Code (1975, 1997 Repl.Vol.), § 8–204 of the Commercial Law Article ("CL" or "U.C.C."). The General Revisor's Note to the Maryland Uniform Commercial Code indicates that, except for "corrective changes" and Article 9, the Maryland U.C.C. contains the same language as the U.C.C. Thus, reference to "U.C.C." is used interchangeably. Unless otherwise stated, citations to the Commercial Law Article will be to the provisions in force at the time the lawsuit was filed.

**6.** Appellant has not appealed the trial court's dismissal of this count.

claims against each other, and AST brought third party complaints against Dean Witter, Rodgers, Prousalis, and Prousalis's wife, Gayle. A scheduling order was entered in the case establishing July 19, 1999, as the discovery deadline. The discovery deadline was extended several times, ultimately to April 14, 2000.

The numerous postponements of the discovery deadline were mostly due to difficulties in scheduling the depositions of Rodgers and Prousalis. At the time of the suit, both Rodgers and Prousalis asserted lack of personal jurisdiction and refused to be deposed. Rodgers was deposed on October 26, 1999, on the sole issue of personal jurisdiction, and by order of court dated April 19, 2000, he was dismissed from suit. The deposition of Thomas Prousalis was completed on March 22, 2000, the same day the court ruled that he was subject to the personal jurisdiction of the court. Rodgers was deposed a second time, as a non-party material witness, on April 29, 2000.

On May 3, 2000, the trial court entered an order extending the deadline for filing dispositive motions to May 19, 2000. Both e-Net and AST filed motions for summary judgment.[7] On the last day for filing dispositive motions, and prior to filing an opposition to e-Net's motion for summary judgment, Prudential filed an Amended Complaint. The Amended Complaint amended Count III against AST for breach of warranty, this time basing it on U.C.C. §§ 8–109(a) & (b). The Amended Complaint also added

Count IV negligence, against AST and e-Net

Count V intentional concealment, against e-Net

Count VI deceit, against e-Net

Count VII negligent hiring and supervision, against e-Net

Count VIII constructive fraud, against e-Net

---

7. e-Net filed its motion for summary judgment on May 10, 2000, while AST filed its motion for summary judgment on May 19, 2000.

Count IX injurious falsehood, against e-Net.

Both e-Net and AST moved to strike the Amended Complaint.

On June 30, 2000, a hearing was held on appellees' motions to strike the Amended Complaint and the motions for summary judgment. The trial court granted both the motions to strike and the motions for summary judgment. The trial court entered a final judgment by written order dated July 11, 2000, which was entered on July 19, 2000. The judgment reads as follows:

The Court, having granted the motions of e-Net, Inc. and [AST] to strike the First Amended Complaint and for summary judgment for the reasons stated on the record on June 30, 2000; and having further dismissed the third party claims of [AST] against Dean Witter Reynolds, Inc. and Thomas T. Prousalis, Jr. based on the grant of the aforesaid motion for summary judgment; and now granting the unopposed motion for voluntary dismissal of e-Net, Inc's counterclaims; and further now dismissing all cross claims between e-Net, Inc. and [AST], now hereby enters this

FINAL JUDGMENT pursuant to Md. Rule 2–601 denying all relief and adjudicating all claims by all parties.

Appellant filed a timely notice of appeal of this order.

## DISCUSSION

### I. Summary Judgment on Count I

### Summary Judgment–Standard of Review

Prudential makes numerous allegations of error in the trial court's granting of summary judgment. Although we will discuss each allegation separately, we will first set forth the standard of review and the full text of the trial court's ruling.

"A court should grant a motion for summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." *Taylor v. NationsBank N.A.*, 128 Md.App. 414, 417, 738 A.2d 893 (1999), *cert. granted*, 357 Md. 481, 745 A.2d 436 (2000). "In considering a motion for summary judgment, the

trial court does not determine any disputed facts, but instead rules on the motion as a matter of law." *Geduldig v. Posner,* 129 Md.App. 490, 504, 743 A.2d 247 (1999). When reviewing a trial court's grant of a motion for summary judgment, this Court reviews the trial court's ruling to determine if the trial court was legally correct. *Williams v. Mayor & City Council of Baltimore,* 359 Md. 101, 113, 753 A.2d 41 (2000). The trial court's "legal determinations are not entitled to a presumption of correctness; this Court must apply the law as it understands the law to be." *Hoffman v. United Iron & Metal Co.,* 108 Md.App. 117, 132, 671 A.2d 55 (1996) (citing *Rohrbaugh v. Estate of Stern,* 305 Md. 443, 446 n. 2, 505 A.2d 113 (1986)).

## Trial Court's Ruling on Summary Judgment

The trial court granted summary judgment in favor of appellees, stating:

All right. The facts are not in dispute. Preliminarily, I want to say I've made some comments about the length of the pleadings and briefs that have been filed, and I do want to say that on all sides they have been well briefed and well prepared and set forth on behalf of all parties the positions [and] the applicable law.

And it does come down to a question of law with respect to the undisputed facts, and taking it in a nutshell it can be viewed in two aspects. One is whether or not there is a violation under U.C.C., specifically section 8–204; and,

Secondly, whether there is a cause of action that can be maintained under the traditional negligence cause of actions that have been briefed in the pleadings. There is no doubt that a mistake was made in the removal of the legend, the restrictive legend, and it's that mistake which has led to the filing of the lawsuit by Prudential.

There's also no dispute that the restrictions that were erroneously removed were never enforced against the Plaintiff and, frankly, it's that aspect of this case that causes the Plaintiff its biggest hurdle, from my perspective.

Normally, proximate cause in the Court of Appeals, the decisions are legion and those are Findings of Fact that need to be made by the trier of fact and the proximate cause is to be liberally interpreted to allow a claim to go forward.

But in this instance, there is absolutely no dispute that the removal of those restrictions led to the injury that was suffered by the Plaintiff, that what caused the injury to the Plaintiff was the drop in stock.

The restrictions were [not] enforced, and the removal of that restriction did not proximately cause the damage that Plaintiff is seeking to recover in this case.

Based upon my review of the pleadings and the exhibits and the documents that have been filed in this case, I'm satisfied that the undisputed facts in this case establish that the Plaintiff does not have a cause of action against the Defendants for negligence, that the Plaintiff, in essence, assumes the risk of the loss that it suffered, and that the Plaintiff was contributorily negligent in making its loan to Mr. Prousalis, which ultimately resulted in the damages.

I am also satisfied that there was no misrepresentation which was made by either of the Defendants; and

Finally, that there is no claim that exists under Section 8–204 of the U.C.C., and that there was no breach of any duty, and there was, in fact, no duty owed to the Plaintiff under the facts of this case.

Accordingly, I'll grant the Motion for Summary Judgment that's been filed on behalf of AST and e-Net.

We find no error in the trial court's ruling as to the counts before it (counts 1 and 2), and therefore affirm the judgment of the trial court. We explain.

### *U.C.C. § 8–204 Cause of Action for Negligence*

Prudential argues that the trial court erred in ruling that there is no cause of action for negligence pursuant to U.C.C. § 8–204 and under Maryland common law. Prudential contends that *Neidiger/Tucker/Bruner, Inc. v. SunTrust Bank,*

242 Ga.App. 369, 530 S.E.2d 18 (2000), "unequivocally removes any doubt that appellant has a viable cause of action under § 8–204."

### A. Cause of Action Under U.C.C. § 8–204

 In addressing the issue of whether a cause of action under U.C.C. § 8–204 exists, we begin, as we must, with the plain language of the statute. U.C.C. § 8–204, which is codified in Md.Code Ann. (1975, 1990 Repl.Vol.), § 8–204 of the Commercial Law article, provides:

§ 8–204. Issuer's restrictions on transfer

A restriction on transfer of a security imposed by the issuer, even if otherwise lawful, is ineffective against a person without knowledge of the restriction unless:

(1) The security is certificated and the restriction is noted conspicuously on the security certificate; or

(2) The security is uncertificated and the registered owner has been notified of the restriction.

On its face, U.C.C. § 8–204 cannot be read to create an express cause of action for damages on behalf of a person against another for failure to note a restriction on the certificate. As Official Comment 1 states, "[t]his Section deals only with the consequences of failure to note the restriction on a security certificate." A person who has no knowledge of an unnoted restriction is not bound by it. He is not damaged because the person who fails to note a restriction on a certificate is obligated to register the transfer despite the restriction.

Citing *SunTrust*, 242 Ga.App. 369, 530 S.E.2d 18, and *Dean Witter Reynolds, Inc. v. Selectronics, Inc.*, 188 A.D.2d 117, 594 N.Y.S.2d 174 (1993), Prudential argues that the case law has interpreted § 8–204 to provide a cause of action. In *SunTrust*, two companies each purchased 500,000 shares of Allegiant stock using promissory notes that totaled $1 million. 242 Ga.App. at 370, 530 S.E.2d 18. In exchange for the acceptance of the promissory notes as payment, the two companies agreed not to "sell, pledge, or hypothecate" the Allegiant

shares until the notes were paid in full and the shares were registered under the applicable securities laws. Sun Trust, acting as Allegiant's transfer agent, was aware of these restrictions on the shares. Nevertheless, it prepared the stock certificates without noting the restrictions. The companies then pledged their Allegiant shares to Neidiger/Tucker/Bruner ("NTB") as collateral for margin trading accounts.

Before accepting the Allegiant shares as collateral, NTB contacted a representative of Sun Trust, who confirmed that there were no restrictions on the shares. *SunTrust,* 242 Ga.App. at 370, 530 S.E.2d 18. Similar to this case, NTB sold 310,000 shares of the Allegiant stock to cover a margin call for the two companies. Sun Trust, however, issued a stop transfer order and informed NTB that the securities were not registered and were restricted. NTB then had to purchase additional Allegiant shares on the open market to cover the shares it had already contracted to sell at a cost of $508,000.

In *Selectronics,* Dean Witter began selling Selectronics shares in accordance with instructions from BIL Banque Internationale a Luxembourg (Suisse) S.A. 188 A.D.2d at 118, 594 N.Y.S.2d 174. The Selectronics shares appeared to be fully negotiable, but when Dean Witter sent them to a securities clearing house for reregistration, the transfer agent refused them and returned them to Dean Witter. When Dean Witter received the shares back from the transfer agents, they contained legends that had not appeared before. The court found that Dean Witter " 'as pledgee was among the persons protected generally by § 8–204 against a restriction not conspicuously noted on the security, except as to a person with actual knowledge. The wrongful refusal to transfer gave rise to a right to sue as for conversion by the . . . transferor.' " *Id.,* at 121, 594 N.Y.S.2d 174 (quoting *Edina State Bank v. Mr. Steak, Inc.,* 487 F.2d 640, 644 (1973)).

█ Prudential is correct in stating that courts have found a cause of action for negligent misrepresentation and conversion pursuant to U.C.C. § 8–204. *SunTrust,* 242 Ga.App. at 371–73, 530 S.E.2d 18; *Selectronics,* 188 A.D.2d at 121, 594

N.Y.S.2d 174. The difference between *SunTrust, Selectronics*, and the instant case is that when NTB and Dean Witter sought to sell shares on the market, transfer of the shares was refused by the transfer agent. *SunTrust*, 242 Ga.App. at 370, 530 S.E.2d 18; *Selectronics*, 188 A.D.2d at 118–19, 594 N.Y.S.2d 174. Sun Trust and Selectronics, therefore, were liable under § 8–204 for their failure to note the restrictions on the shares and for damages arising from their failure to register the transfer. *SunTrust*, 242 Ga.App. at 372, 530 S.E.2d 18; *Selectronics*, 188 A.D.2d at 121, 594 N.Y.S.2d 174. In the case of *SunTrust*, it had represented to NTB that the shares were unrestricted. Here, neither e-Net nor AST refused to register Prudential's transfers or attempted to issue a stop transfer order on the sale. Prudential received the benefit provided to a "person without knowledge" by U.C.C. § 8–204 when it was allowed to sell restricted shares of stock to cover its margin call.

■ Further, the damages in *SunTrust* represented the amount of money NTB had to expend buying shares on the open market in order to cover for those shares subject to Sun Trust's stop transfer order.[8] In the case at bar, Prudential did not have to purchase additional e-Net shares on the open market to cover the restricted shares; it simply asserts damages in the amount it lost because of the decline in market value of the shares that it sold. U.C.C. § 8–204 was intended to protect innocent parties from having an unnoted restriction enforced against them, and Prudential reaped the benefit of this provision. *See SunTrust*, 242 Ga.App. at 372, 530 S.E.2d 18; *see also* Official Comments to U.C.C. § 8–204.

We are not unsympathetic to Prudential's losses. We agree that AST erred in failing to note the restrictions on the e-Net certificates. However, appellees did not enforce the restrictions against Prudential, and thus, Prudential is without a cause of action against appellees under U.C.C. § 8–204.

---

**8.** The issue of damages was not before the *Selectronics* court. 188 A.D.2d at 119, 594 N.Y.S.2d 174.

Prudential's claim under Count 1 of its complaint, which concerns § 8–204, is labeled "§ 8–204 and negligence." We note that Prudential appeared to argue before the trial court in the alternative. That is, if there was no cause of action arising under the statute in its own right, Prudential appeared to argue that § 8–204 creates a duty that would allow Prudential to claim negligence.[9] We thus turn to whether Prudential could have a valid negligence cause of action based on breach of a duty established by § 8–204.

## B. Duty

Appellees argue that Prudential failed to show that either e-Net or AST owed it a duty. The duty arising out of U.C.C. § 8–204 forms the basis for the negligence claim in Count I of Prudential's Complaint.

In Maryland, in order to establish a cause of action for negligence, a plaintiff must prove: a duty owed to the plaintiff or to a class of which the plaintiff is a part; a breach of that duty; a causal relationship between the breach and the harm; and damages suffered. *See Jacques v. First Nat'l Bank,* 307 Md. 527, 531, 515 A.2d 756, 758 (1986); *Cramer v. Housing Opportunities Comm'n,* 304 Md. 705, 712, 501 A.2d 35, 39 (1985); *Scott v. Watson,* 278 Md. 160, 165, 359 A.2d 548, 552 (1976); *Peroti v. Williams,* 258 Md. 663, 669, 267 A.2d 114, 118 (1970). Absent a duty of care, there can be no liability in negligence. *See West Va. Central v. Fuller,* 96 Md. 652, 666, 54 A. 669, 671–72 (1903). There, *id.* at 666, 54 A. at 671–72, we stated:

> "[T]here can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another. . . . As the duty owed varies with circumstances and with the relation to each other of the individuals concerned, so the alleged negligence varies, and the act complained of never amounts to negligence in law or fact, if there has been no breach of duty."

---

**9.** Duty, of course, is an essential element of a negligence action. *See, e.g., Stickley v. Chisholm,* 136 Md.App. 305, 314, 765 A.2d 662 (2001).

*Walpert, Smullian & Blumenthal, P.A. v. Katz,* 361 Md. 645, 655, 762 A.2d 582 (2000).

▉ Prudential alleges that it suffered an economic loss as a result of both e-Net and AST's failure to ensure that Prousalis's shares carried the proper legend so that Prudential would know they were restricted and, therefore, would refuse to accept the shares as collateral for a margin loan. It is undisputed that Prudential never contacted either appellees or Prousalis on the day the loan to Prousalis was approved to determine if the shares were subject to restriction. It is also undisputed that e-Net intended Prousalis's shares to be restricted, that it instructed AST to ensure that they bear a legend, that its internal records reflect the restrictions, and that AST failed to follow e-Net's instructions.

▉ The Court of Appeals has held that,

[i]n determining whether a tort duty should be recognized in a particular context, two major considerations are: the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties. Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent. By contrast, where the risk created is one of personal injury, no such direct relationship need be shown, and the principal determinant of duty becomes foreseeability.

*Jacques,* 307 Md. at 535, 515 A.2d 756 (footnote and citations omitted). Because Prudential suffered purely economic losses in this case, we must look at Prudential's relationship with both e-Net and AST. "Finding an intimate nexus requires consideration of numerous factors." *Griesi v. Atlantic General Hosp. Corp.,* 360 Md. 1, 13, 756 A.2d 548 (2000).

The Court of Appeals has provided guidance for determining whether privity giving rise to a duty exists between two parties:

"Liability [for negligent misrepresentation] arises only where there is a duty, if one speaks at all, to give the correct information. And that involves many considerations. There must be knowledge, or its equivalent, that the information is desired for a serious purpose; that he to whom it is given intends to rely and act upon it; that, if false or erroneous, he will because of it be injured in person or property. Finally, the relationship of the parties, arising out of contract or otherwise, must be such that in morals and good conscience the one has the right to rely upon the other for information, and the other giving the information owes a duty to give it with care. An inquiry made of a stranger is one thing; of a person with whom the inquirer has entered, or is about to enter, into a contract concerning the goods which are, or are to be, its subject, is another."

*Weisman v. Connors,* 312 Md. 428, 447, 540 A.2d 783 (1988) (quoting *International Products Co. v. Erie R. Co.,* 244 N.Y. 331, 155 N.E. 662, 664 (1927)).

At the time Prudential made the margin loan to Prousalis, there was no contract between Prudential and either e-Net or AST. We are likewise unconvinced that Prudential was a third-party beneficiary of the contract between e-Net and AST. Clearly, Prudential was not an identified beneficiary of the contract.

Nevertheless, there are situations in which an injured third party may come to be identified as a general class of persons sought to be among the intended beneficiaries of a contract. For example, a tort claimant has been recognized as a third-party beneficiary of a contract of insurance. *See Jones v. Hyatt Ins. Agency, Inc.,* 356 Md. 639, 658, 741 A.2d 1099 (1999).

The e-Net/AST contract was intended, at least in part, to protect e-Net shares from devaluation by limiting an affiliate's [10] opportunity to dump restricted shares onto the open

---

10. An affiliate is "[o]ne who controls, is controlled by, or is under common control with an issuer of a security." Black's Law Dictionary 59 (7th ed.1999) (citing 17 C.F.R. § 240.10b–18(a)(1)).

market. That protection would benefit unrelated third party shareholders. These unrelated third parties may be in the position of Prudential, which extended margin loans on restricted shares, but, more likely, they would be investors purchasing e-Net stock. A similar situation exists in the insurance context, where the insured and insurer enter into a contract to protect the insured from third-party tort liability in the event of an accident. The third-party tort claimant may benefit from the insurance contract.

Even if we were to assume that Prudential was a third-party beneficiary of the e-Net/AST contract, a tort duty still does not automatically arise under this theory. In *Jones*, the petitioners, the Joneses, had been involved in an automobile accident with a company vehicle driven by Robert Smith and owned by K & D Auto, Inc. K & D believed that it was insured at the time of the accident by respondent Hyatt Insurance Agency, Inc. Their vehicles were not insured by Hyatt, however, until three weeks after the accident. At the time of the accident, the vehicles were not covered by any insurance policies.

When the Joneses discovered that they would be unable to recover from Hyatt, they sued Smith and K & D in circuit court and received a total of $900,000 in damages. K & D subsequently assigned to the Joneses its right to sue Hyatt, and both of them filed suit against Hyatt to recover the damages. The Court of Appeals found that, in the suit against Hyatt, their damages were purely economic. *Jones*, at 658, 741 A.2d 1099. Consequently, the Court looked for an "intimate nexus" or "direct relationship" between the Joneses and Hyatt, finding:

> Moreover, there was no "intimate nexus" or "direct relationship" between Hyatt and the Joneses. At the time of the contract between Hyatt and K & D, the Joneses were not even identified third-party beneficiaries of that contract. It was not until the motor vehicle accident that the Joneses fell into a class whose members were among the intended beneficiaries of the contract. *See Napier v. Bertram*, 191 Ariz. 238, 954 P.2d 1389 (1998), where the Supreme Court of

Arizona held that an insurance agent may not be held liable in negligence to a taxicab passenger for failure to procure uninsured motorist coverage for the agent's client, a taxicab company required by state law to have such coverage on behalf of its passengers. The Arizona court noted that, for it to hold a professional liable for negligence, it traditionally required "a duty of care" founded upon the "relationship between the non-client and professional" that "exceeded mere general foreseeability." *Napier*, 191 Ariz. at 242–243, 954 P.2d at 1393–1394.[11]

[11] Under certain circumstances a third-party beneficiary of a contract between principal and agent, who is identified when the contract is entered into, may bring a tort action against the agent who has made representations to the beneficiary or otherwise assumed a duty owed to the beneficiary. *Flaherty v. Weinberg,* 303 Md. 116, 135–137, 492 A.2d 618, 627–628 (1985) (agent allegedly made negligent representations directly to the plaintiff, who was the identified third-party beneficiary of the agency contract, and who was allegedly not in an adversarial position to the principal, and the agent intended that the plaintiff would act upon the representations). The opinion in *Flaherty v. Weinberg,* however, clearly leads to the conclusion that the Joneses would not be entitled to bring a direct tort action against Hyatt.

*Jones,* 356 Md. at 658–59, 741 A.2d 1099.

The Court of Appeals has recently expanded the concept of duty in cases of pure economic loss. *Walpert,* 361 Md. 645, 762 A.2d 582. *Walpert* is an accountant liability case but provides guidance. In many accountant liability cases, a third party has relied on an accountant's statement to invest money or make a loan. *See* Willis W. Hagen II, *Accountants' Common Law Negligence Liabilities to Third Parties,* 1988 Colum. Bus. L.Rev. 181, 207 (1988); *Walpert,* 361 Md. 645, 762 A.2d 582.

In *Walpert,* George and Shirley Katz (jointly the "Katzes") sued their former accountants, Walpert, Smullian & Blumenthal, P.A. ("WS & B"), for negligence, gross negligence, negligent misrepresentation, and breach of contract in connection with loans they had made to Magnetics, Inc. Magnetics was formerly owned by George Katz, who relinquished ownership in 1987 to his wife and two sons. George Katz retained the title of president and remained financially interested, but his son Philip actually controlled the company. After Philip took

control, he retained WS & B to perform annual audits and prepare unaudited reports every six months. WS & B also did personal accounting work for the Katzes.

Between 1990 and 1992, the Katzes entered into four financial transactions with Magnetics. In June 1993, an independent audit revealed that Magnetics had inflated its inventory and accounts receivable. Consequently, Magnetics's principal lender, the Bank of Baltimore, called its $2 million loan. The bank subsequently took possession of Magnetics and liquidated its assets.

The Katzes sued WS & B to recover the losses they suffered as a result of the accounting error. WS & B filed for summary judgment, arguing that the Katzes were not an intended beneficiary of the contract between Magnetics and WS & B. The trial court agreed and granted summary judgment for WS & B. This Court reversed the trial court, finding that, although the Katzes were not third-party beneficiaries of the Magnetics/WS & B contract, there was a genuine dispute of material fact as to whether WS & B nevertheless owed the Katzes a duty of care.

The Court of Appeals affirmed that decision and engaged in a lengthy discussion of how duty arises in this context. The Court first noted that three standards of accountant liability have evolved: the privity standard, as first explained in *Ultramares Corporation v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931); the foreseeability standard, as explained in Restatement (Second) Torts § 522; [11] and the "reasonably foresee-

---

11. Restatement (Second) of Torts § 552 deals with negligently supplying information for the guidance of others and provides, in pertinent part:

(1) One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered:

able" standard, adopted by New Jersey, West Virginia, and Wisconsin.[12] *Walpert,* 361 Md. at 653–54, 762 A.2d 582. With respect to accountant liability to a non-contracting third party, courts that have addressed the issue have used one of the three aforementioned theories to determine whether the accountant is liable:

> A significant number follow the *Ultramares* formulation, under which a third party will be denied relief for an auditor's negligence in the absence of a relationship with the auditor that constitutes privity or that is equivalent to privity. The majority of jurisdictions, however, follow the Restatement approach: liability is imposed on suppliers of commercial information to third parties who are actually foreseen as the users of the information for a particular purpose. The third view, followed by a few jurisdictions, allows third parties to recover for auditor negligence when their reliance on the audit report was reasonably foreseeable by the auditor.

*Walpert,* 361 Md. at 673, 762 A.2d 582 (citations omitted). *See also* Denise M. Orlinski, *An Accountant's Liability to Third Parties: Bily v. Arthur Young & Co.,* 43 DePaul L.Rev. 859, 871–72 (1994).

In *Katz v. Smullion Walpert,* No. 202, Sept. Term 1997, 119 Md.App. 817 (filed January 29, 1998), this Court had adopted the first test as formulated by the Court of Appeals of New York in *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985). The *Credit Alliance* court held:

> (a) by the person or one of a limited group or persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
>
> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

12. *See H. Rosenblum, Inc. v. Adler,* 93 N.J. 324, 461 A.2d 138 (1983); *First Nat'l Bank v. Crawford,* 182 W.Va. 107, 386 S.E.2d 310 (1989); *Citizens State Bank v. Timm, Schmidt & Co.,* 113 Wis.2d 376, 335 N.W.2d 361 (1983).

Before accountants may be held liable in negligence to noncontractual parties who rely to their detriment on inaccurate financial reports, certain prerequisites must be satisfied: (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance. While these criteria permit some flexibility in the application of the doctrine of privity to accountants' liability, they do not represent a departure from the principles articulated in *Ultramares, Glanzer*[ *v. Shepard*, 233 N.Y. 236, 135 N.E. 275 (1922) ] and *White*[ *v. Guarente*, 43 N.Y.2d 356, 401 N.Y.S.2d 474, 372 N.E.2d 315 (1977) ], but, rather, they are intended to preserve the wisdom and policy set forth therein.

*Credit Alliance*, 65 N.Y.2d at 551, 493 N.Y.S.2d 435, 483 N.E.2d 110.

The Court of Appeals agreed with this Court that "the appropriate analysis is that enunciated in *Credit Alliance.*" *Walpert*, 361 Md. at 692, 762 A.2d 582. The Court noted, however:

Credit Alliance has clarified the ambiguity surrounding the nature of the relationship between the plaintiff and the defendant sufficient to constitute the required nexus that approaches privity under *Ultramares* and *Glanzer*. Clearly, it must be such that would allow the defendant to predict its liability exposure. Nevertheless, one of the criteria remains unclear, the nature of the link between the accountant and the non-contractual plaintiff required to satisfy the *Credit Alliance* test.

*Walpert*, 361 Md. at 690, 762 A.2d 582. The Court of Appeals noted that the nature of the link between the accountant and the non-contractual plaintiff must be something specific enough that the accountant should realize that the plaintiff will

rely on it. *Id.* at 691–92, 762 A.2d 582. The Court relied on *Security Pacific Business Credit, Inc. v. Peat Marwick Main & Co.*, 79 N.Y.2d 695, 586 N.Y.S.2d 87, 597 N.E.2d 1080 (1992), which held that the plaintiff could not rely on a telephone conversation which was " 'limited to generalities that nothing untoward had been uncovered in the course of the audit and that an unqualified opinion would issue, certifying the tentative draft which plaintiff had received' " to create the necessary link. *Id.* at 705, 586 N.Y.S.2d 87, 597 N.E.2d 1080 (quoting *Security Pacific Business Credit, Inc. v. Peat Marwick Main & Co.*, 165 A.D.2d 622, 626, 569 N.Y.S.2d 57 (1991)).

In applying the *Credit Alliance* test to the instant case, we find no link between Prudential and either e-Net or AST. It is clear that Prudential, on the day that it made the loan, had no contact with either e-Net or AST. Under the circumstances, there is no way that either appellee could have realized, or foreseen, that Prudential was going specifically to rely on the fact that the e-Net stock being used as collateral contained no legends. Because there was no meaningful link between Prudential and appellees, neither appellee had a duty to Prudential. Consequently, we need not decide whether the first two prongs of the *Credit Alliance* test were met.

### C. § 8–204 and General Provisions of the U.C.C.

Prudential argues that the trial court "erred because its decision is inconsistent with the general provisions of the U.C.C." It cites in particular U.C.C. § 1–106:

§ 1–106. Remedies to Be Liberally Administered.[13]

---

13. The Maryland provision is almost identical:

(1) The remedies provided by Titles 1 through 10 of this article shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed but neither consequential or special nor penal damages may be had except as specifically provided in Titles 1 through 10 of this article or by other rule of law.

(2) Any right or obligation declared by Titles 1 through 10 of this article is enforceable by action unless the provision declaring it specifies a different and limited effect.

(1) The remedies provided by this Act shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed but neither consequential or special nor penal damages may be had except as specifically provided in this Act or by other rule of law.

(2) Any right or obligation declared by this Act is enforceable by action unless the provision declaring it specifies a different and limited effect.

At argument, Prudential also pointed us to Comment 2, relating to this provision, which states:

Under subsection (2) any right or obligation described in this Act is enforceable by court action, even though no remedy may be expressly provided, unless a particular provision specifies a different and limited effect. Whether specific performance or other equitable relief is available is determined not by this section but by specific provisions and by supplementary principles. Cf. Sections 1–103, 2–716.

We agree that § 1–106 requires damages to be liberally administered, but in this case § 8–204 specifies and limits the remedy. As stated above, Prudential already reaped the benefits of § 8–204, because it was able to sell Prousalis's restricted shares as if they were unrestricted. Prudential's argument with respect to § 1–106 is unconvincing.

## II. Proximate Cause

■ Prudential next argues that the trial court erred when it found that "the removal of that restriction did not proximately cause the damage that Plaintiff is seeking to recover" in Count I, negligence, of its Complaint. Prudential asserts that, had it known of the restrictions on the securities, it would not have made the margin loan to Prousalis, and that such "transaction causation" is sufficient to satisfy the proximate cause requirement. It further asserts that e-Net was aware that sales of pre-IPO securities on the open market

---

CL § 1–106.

prior to expiration of the lockup agreement would depress the value of the shares.

Prudential, however, cites no authority for its position that it can recover for negligence by simply asserting it would not have made the loan if it knew the shares were subject to restrictions. To the contrary, appellees cite *Lustine Chevrolet v. Cadeaux,* 19 Md.App. 30, 36–37, 308 A.2d 747 (1973), for the proposition that, in order to establish proximate causation or a causal connection between the negligence and the injury, one must allege more than the fact that it would not have entered into the transaction but for the misrepresentation. We find *Lustine* and appellees' argument persuasive.

In *Lustine,* the plaintiff bought a used car from the defendant. Prior to the sale, plaintiff inquired as to whether the automobile had ever been involved in an accident. The defendant, although knowing that the car had been in an accident, responded that it had not. After purchasing the car, plaintiff experienced numerous problems with the car, including inoperative windshield wipers, problems with the car stalling, transmission problems, excessive wear on shocks and tires, shaking, and alignment problems. It was later discovered that the vehicle had been in an accident prior to plaintiff's purchase and that repairs had been made to the car's bumper, bumper bracket, radiator support, front fender, and molding.

The plaintiff sued the defendant for breach of contract, breach of warranty, and fraud, asserting that she would not have purchased the car had she known of the prior accident. *Lustine,* 19 Md.App. at 34, 308 A.2d 747. In analyzing whether the plaintiff had a cause of action in fraud against the defendant, this Court relied on the causal connection requirement used in negligence cases, stating:

> With respect to negligence cases, it has been held that in order to establish causal connection, the plaintiff must show that there is a reasonable probability or reasonable certainty that the act complained of caused the injury suffered. Mere possibility is not enough. *Sun Cab Co. v. Carter,* 14 Md.App. 395, 408, 287 A.2d 73, 80 (1972). Reasonable

probability can be shown by either direct evidence or inferences drawn from surrounding circumstances.... **[I]n order to recover, the plaintiff must have introduced some evidence to show a reasonable probability that the malfunctioning of the Camaro after her purchase was caused by the damage sustained by the vehicle in the accident of 20 October 1970.**

*Lustine,* 19 Md.App. at 36, 308 A.2d 747 (emphasis added). In *Lustine,* the Court found that the plaintiff could not recover for fraud or negligent misrepresentation because she had failed to prove that the prior accident proximately caused her damages. An allegation that she would not have purchased the vehicle had she known about the prior accident was insufficient. *Id.* at 38, 308 A.2d 747.

Prudential argues, like the plaintiff in *Lustine,* that it would not have engaged in a transaction if it had particular knowledge that Prousalis's e-Net shares were subject to restrictions. e-Net and AST contend that Prudential's damages were caused by a fall in stock price and Prousalis's failure to meet his margin call. The fact that Prousalis's shares were restricted did not cause the market value to decline.

Prudential argues that appellees' failure to include the proper legend on Prousalis's stock certificates was the proximate cause of its loss on the margin loan to Prousalis, relying heavily on e-Net's Registration statement to the Securities and Exchange Commission ("SEC"), in which it stated, in part:

However, pursuant to the terms of the Underwriting Agreement, the stockholders of the Company have agreed not to sell, transfer, assign or otherwise dispose of any restricted securities of the Company for a period of 24 months following the date of this Prospectus....

Prospectus investors should be aware that the possibility of sales may, in the future, have a depressive effect on the price of [e-Net's] Common Stock in any market which may develop and, therefore, the ability of any investor to market

his shares may be dependent directly upon the number of shares that are offered and sold.

e–Net's awareness that the sale of pre-IPO restricted shares on the open market could decrease the market value of all e-Net shares, however, does not equate to proximate cause.[14] When Prudential first began to sell Prousalis's e-Net shares, it received $4.03 per share. As it continued to sell the restricted shares, the price actually rose slightly, to $4.63 per share. This would suggest that the sale of the restricted shares did not **decrease** the market value of the shares and was not, in itself, the proximate cause of Prudential's injury. There is no evidence to the contrary.

### III. & IV. Assumption of the Risk and Contributory Negligence

Prudential argues that the trial court erred in making a finding on the issues of assumption of the risk and contributory negligence. He argues that both issues should have been submitted to the jury, as there were disputed issues of material fact.

The defenses of contributory negligence and assumption of the risk "are closely related and often overlapping defenses." *Schroyer v. McNeal,* 323 Md. 275, 280, 592 A.2d 1119 (1991). "They may arise from the same facts and, in a given case, a decision as to one may necessarily include the other." *Schroyer,* 323 Md. at 280, 592 A.2d 1119. There are, however, slight differences between the two theories. The case of *Warner v. Markoe,* 171 Md. 351, 359–60, 189 A. 260, 264 (1937), is often cited for its discussion of the two doctrines:

The distinction between contributory negligence and voluntary assumption of risk is often difficult to draw in concrete

---

14. There was evidence that Prudential may have extended margin loans to other customers, possibly on restricted e-Net shares, but this case was centered around Prousalis's activities. Thus, it is unclear whether any other restricted e-Net shares made their way onto the open market, either through Prudential or someone else. Of Prousalis's 693,200 shares of e-Net stock, at least 400,000, or approximately 58%, were restricted.

cases, and under the law of this state[,] usually without importance, but it may be well to keep it in mind. Contributory negligence, of course, means negligence which contributes to cause a particular accident which occurs, while assumption of risk of accident means voluntary incurring [the risk] of an accident which may not. occur, and which the person assuming the risk may be careful to avoid after starting. Contributory negligence defeats recovery because it is a proximate cause of the accident which happens, but assumption of the risk defeats recovery because it is a previous abandonment of the right to complain if an accident occurs.

 Of course, both assumption of the risk and contributory negligence are a complete bar to recovery. *Crews v. Hollenbach*, 358 Md. 627, 640, 751 A.2d 481 (2000) (assumption of the risk); *Kassama v. Magat*, 136 Md.App. 637, 657, 767 A.2d 348 (2001) (contributory negligence).

## A. Assumption of the Risk

 In assumption of the risk, "by virtue of the plaintiff's voluntary actions, any duty the defendant owed the plaintiff to act reasonably for the plaintiff's safety is superseded by the plaintiff's willingness to take a chance." *Schroyer*, 323 Md. at 282, 592 A.2d 1119. Thus, unlike contributory negligence, assumption of the risk does not require a finding that the plaintiff was negligent; it is sufficient that the plaintiff was aware of the risk, and voluntarily assumed it. *Schroyer*, 323 Md. at 283, 592 A.2d 1119.

Here, the trial court found that Prudential both assumed the risk inherent in making the margin loan and was contributorily negligent in failing to investigate the saleability of the shares. It was not necessary for the trial court to make a finding on both issues, as a finding against Prudential on either theory would have barred its recovery.

 "The defense [assumption of the risk] is grounded on the theory that a plaintiff who voluntarily consents, either expressly or impliedly, to exposure to a known risk cannot

later sue for damages incurred from exposure to that risk." *Crews,* 358 Md. at 640, 751 A.2d 481. In order to establish the defense of assumption of risk, the defendant must show that the plaintiff: (1) had knowledge of the risk of the danger; (2) appreciated that risk; and (3) voluntarily confronted the risk of danger. *ADM Partnership v. Martin,* 348 Md. 84, 91, 702 A.2d 730 (1997).

 Appellees assert that the danger confronted by Prudential was risk of a decline in stock price. Prudential, on the other hand, asserts that the danger at issue was "the danger that the Collateral Shares would not bear restrictive legends or would not be subject to stop transfer instructions, as required by statute." Prudential further argues that because the parties themselves could not agree as to what constituted the danger involved, the issue should have been decided not by the trial court on summary judgment, but by the trier of fact. Although Prudential is correct that whether a risk is assumed is usually decided by the trier of fact, " 'where it is clear that any person in his position must have understood the danger, the issue may be decided by the court.' " *Imbraguglio v. Great Atlantic & Pacific Tea Co., Inc.,* 358 Md. 194, 212, 747 A.2d 662 (2000)(quoting W.P. Keeton et al., Prosser and Keeton on the Law of Torts § 68, at 489 (Lawyer's 5th ed.1984)).

In this transaction, Prudential was confronted with several risks, including both the general vicissitudes of the equity market and, more specifically, the risk that the stock pledged as collateral may be subject to some restriction that affected values or transferability or both. It is clear that appellant as a sophisticated participant in financial transactions and lending must have understood these risks. The facts giving rise to the loan that is the subject of this suit clearly indicate that Prudential understood the risks of margin lending.

Prousalis applied to Prudential for the margin loan on August 7, 1998, after Rodgers had been recruited to Prudential's Clearwater branch. Douglas Haas managed the Clearwater branch, and Karen Tarleton was its operations manager.

The decision whether to loan the money fell to Prudential's Senior Vice-President of Credit Control Administration, Joseph Luino. Luino stated in his deposition that Haas was pressuring him into approving the loan.

Luino was concerned that Haas was trying to rush his decision, and he was particularly concerned about possible restrictions on the shares. He consulted with Valerie Kerr of Prudential's Executive Strategies and Services ("ESS") department, which is responsible for giving guidance on the saleability of stock offered as collateral on margin loans. Neither Luino nor Kerr, however, contacted Prousalis or e-Net prior to making the loan to determine directly whether the shares were restricted. Luino stated that Kerr advised him on August 7, the same day Prousalis applied for the loan, that the shares were unrestricted, although Kerr states that she did not make such a statement. Luino said that he also relied on the fact that the shares were coming through DTC, because restricted shares "are usually not free to be delivered through the DTC system." Luino approved the loan on August 7, 1998.

That same day, Tarleton faxed Kerr some information concerning the proposed loan. Kerr advised Tarleton that the information was insufficient and told her to fill out a specific checklist, which Kerr said she never received. Consequently, because the ESS department never gave formal approval of the loan, Kerr assumed that it had not been made.

The loan clearly was approved without Prudential knowing whether the shares were restricted and contrary to Prudential's internal procedures. Although, by all accounts, the loan would not have been made with restricted shares as collateral, there was clearly a breakdown in Prudential's system for double checking this information.

By failing to follow its own internal guidelines, Prudential was assuming the risk that its failure to do so would result in accepting restricted stock as collateral for a large margin loan. On the other hand, the most obvious consequence of the more specific assumed risk never materialized in that no stop trans-

fer order was ever issued, and Prudential was able to freely transfer the shares of stock.

The second risk Prudential undertook was the risk that the value of the e-Net shares could decrease after it made the loan. This risk is inherent in all stock trading, but particularly in trading "new economy" stocks, as we have recently seen. Any person trading securities both realizes and voluntarily assumes the risk. *See Wolf v. Ford,* 335 Md. 525, 537, 644 A.2d 522 (1994). We therefore find no error in the trial court's ruling.

## B. Contributory Negligence

Again, "[c]ontributory negligence is that degree of reasonable and ordinary care that a plaintiff fails to undertake in the face of an appreciable risk which cooperates with the defendant's negligence in bringing about the plaintiff's harm." *Bd. of County Comm'rs of Garrett County v. Bell Atlantic–Maryland, Inc.,* 346 Md. 160, 180, 695 A.2d 171 (1997). "Before the doctrine of contributory negligence can be invoked, it must be demonstrated that the injured party, the owner, acted or failed to act, with knowledge and appreciation, either actual or imputed, of the danger of injury which his conduct involves." *State v. Thurston,* 128 Md.App. 656, 665, 739 A.2d 940 (1999).

The risks inherent in margin lending are discussed in detail above. Moreover, the evidence showed that Prudential knew of the risks but failed to follow its own internal procedures for making a margin loan. Assuming that AST and e-Net were negligent, we find Prudential's failures to follow procedure to be more than sufficient to constitute contributory negligence.

Thus, we hold that there was substantial evidence for the court to find, as a matter of law, that Prudential had assumed the risk of the loan and was contributorily negligent in making the loan, thus barring recovery under its negligence claim.

## V. Negligent Misrepresentation Claims

Prudential argues that the trial court erred in granting summary judgment on its claim for negligent misrepresentation, as it had "proved all the essential elements of such a cause of action, including a misrepresentation by e-Net and AST." Again, we disagree.

"Negligent misrepresentation is one variety of a negligence action." *Walpert,* 361 Md. at 654, 762 A.2d 582. To prevail in an action for negligent misrepresentation, the plaintiff must prove "that (1) the defendant, owing a duty of care to the plaintiff, negligently asserted a false statement; (2) the defendant intended that the statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, took action in reliance on the statement, and (5) the plaintiff suffered damage proximately caused by the defendant's negligence." *Swinson v. Lords Landing Village Condominium,* 360 Md. 462, 477, 758 A.2d 1008 (2000). Thus, both duty and proximate cause are required elements of a negligent misrepresentation claim.

As we discussed above, however, neither e-Net nor AST owed a duty to Prudential in this situation. Moreover, in order to prove proximate causation, it is insufficient to state that one would not have entered into the transaction had it known of the misrepresentation. In light of our holdings with respect to duty and proximate causation, we hold that Prudential's claim for negligent misrepresentation also fails.

### VI. Amended Complaint

Appellant argues that the trial court erred in striking its Amended Complaint and asserts that the Amended Complaint relied on information gained "in part" from information gathered through the deposition testimony of Mark Rodgers, which was not made available to it until May 4, 2000, and "documents showing Prousalis's failure to pay for his e-Net stock," which were not produced by e-Net until May 3, 2000.

Based on both these allegations and the fact that no trial date had been set, appellant argues that the Amended Complaint was "diligently and timely made."

Rule 2–341 governs the amendment of pleadings. It provides:

(a) Prior to 15 Days of Trial Date. A party may file an amendment to a pleading at any time prior to 15 days of a scheduled trial date. Within 15 days after service of an amendment, any other party to the action may file a motion to strike setting forth reasons why the court should not allow the amendment. If an amendment introduces new facts or varies the case in a material respect, an adverse party who wishes to contest new facts or allegations shall file a new or additional answer to the amendment within the time remaining to answer the original pleading or within 15 days after service of the amendment, whichever is later. If no new or additional answer is filed within the time allowed, the answer previously filed shall be treated as the answer to the amendment.

\* \* \*

(c) Scope. An amendment may seek to (1) change the nature of the action or defense, (2) set forth a better statement of facts concerning any matter already raised in a pleading, (3) set forth transactions or events that have occurred since the filing of the pleading sought to be amended, (4) correct misnomer of a party, (5) correct misjoinder or nonjoinder of a party so long as one of the original plaintiffs and one of the original defendants remain as parties to the action, (6) add a party or parties, (7) make any other appropriate change. Amendments shall be freely allowed when justice so permits. Errors or defects in a pleading not corrected by an amendment shall be disregarded unless they affect the substantial rights of the parties.

Rule 2–341 provides for the liberal allowance of amendments "in order to prevent the substantial justice of a cause from being defeated by formal slips or slight variances." *E.G. Rock, Inc. v. Danly,* 98 Md.App. 411, 428, 633 A.2d 485

(1993). They should be allowed " 'so long as the operative factual pattern remains essentially the same, and no new cause of action is stated invoking different legal principles.' " *Hartford Accident & Indem. Co. v. Scarlett Harbor Asso. Ltd. Partnership,* 109 Md.App. 217, 248, 674 A.2d 106 (1996)(quoting *Gensler v. Korb Roofers, Inc.,* 37 Md.App. 538, 543, 378 A.2d 180 (1977)), *aff'd* 346 Md. 122, 695 A.2d 153 (1997). "[A] trial court should not grant leave to amend if the amendment would result in prejudice to the opposing party or undue delay." *Scarlett Harbor,* 109 Md.App. at 248, 674 A.2d 106. The determination of whether to grant leave to amend pleadings rests within the sound discretion of the trial court. *Scarlett Harbor,* 109 Md.App. at 248, 674 A.2d 106 (citations omitted).

In striking appellant's Amended Complaint, the trial court found:

> As everyone knows, the rules permit a liberal amendment of complaints, and that is a procedure that has been followed with few exceptions, and I certainly have a history of granting amendments to complaints.
>
> The issue is whether or not there is prejudice.
>
> There's some additional issues that concern me. One is that this case has been pending for an inordinate period of time. We are no[w] into 19 court jackets, and I can only imagine what that translates into with respect to filing cabinets in counsels' offices.
>
> It's unfortunate that we haven't crashed into number 20 by today, but I'm sure we will by tomorrow.
>
> In any event, it's a significant number of pleadings that have been filed in this case, that have been pending for a lengthy period of time. Discovery has been ongoing for a lengthy period of time, and there comes a point in time when the case needs to move forward.
>
> Th[ere] also is, from my perspective, the issue of filing an Amended Complaint, which was filed shortly before the hearing on dispositive motions, and can be viewed as an

effort to circumvent the dispositive motions that are pending and ready to be heard today.

The issue of prejudice, as I see it, is that there are additional claims being made, which would require additional discovery and which would require an additional effort by the defense in order to locate or identify an additional expert witness or witnesses to testify as to allegations being brought into the case.

In addition, the amendments in the allegations that are being made are not allegations that are new as far as the information is concerned. It's information that was in the possession of the Plaintiff well before May 19.

So the late filing, as I see it, does prejudice the Defendants. It's prejudicial to the proper management of this case and should have been attempted well in advance of May 19. I see no valid reason even giving the liberal amendment policy to permit the filing of the amended complaint. Accordingly, I'll grant the motion to strike the Amended Complaint.

In essence, the trial court found that the additional claims asserted in the Amended Complaint could have been raised at an earlier date and that to allow the Amended Complaint to go forward at this stage in the proceedings would be prejudicial to the appellees, as it would require additional discovery and prolong the litigation even further.

Prudential's initial Complaint set forth only three counts: negligence based on U.C.C. § 8–204; negligent misrepresentation; and breach of warranty based on U.C.C. § 8–208. The Amended Complaint, filed approximately a year and a half later, reinserted Count III after amending the claim and added six additional counts. The addition of Count IV, negligence, was premised on e-Net's and AST's alleged negligence in authorizing the removal of the 1933 Securities Act legend. Count V, intentional concealment, Count VI, deceit, and Count VIII, constructive fraud, were based on an August 27, 1998, telephone message to Valerie Kerr, in which e-Net counsel failed to inform Prudential that the shares were subject to a

lockup agreement. Count VII, negligent hiring and supervision, alleged error in e-Net's failure to "investigate AST" and its negligent supervision over AST in ensuring that the lockup agreement continued to be referenced on the stock certificates. The last count, Count IX, injurious falsehood, alleged error in e-Net's releasing a press statement concerning appellant's sale of e-Net shares on the market.

We have reviewed and compared the two complaints. Although Prudential alleges facts in the Amended Complaint not present in the first complaint, we believe that the "operative factual pattern" remains the same and that the Amended Complaint merely contained more factual detail than the original complaint. The prejudice complained of by appellees relates to further delay of the case and additional costs to be incurred, but costs and delay, although unfortunate, are not unusual in complicated commercial litigation.

In light of the policy in this State allowing liberal amendment of the pleadings, and because a trial date was not set at the time the Amended Complaint was filed, we reverse the trial court's ruling granting appellees' motion to strike. We note, however, that in light of our decision affirming the trial court's grant of the motion for summary judgment, discussed above, some of the claims raised in the Amended Complaint may be precluded. For example, in light of our earlier discussion on the risks involved with stock trading as well as the lack of privity between Prudential and e-Net and AST, Count III, breach of warranty, may be precluded. In addition, Count IV relates to negligence, which the trial court may find to be precluded in view of our discussion of negligence and appellees' defenses, *supra*. The other counts appear to involve matters not yet addressed or matters involving e-Net's alleged affirmative representation that Prousalis's shares were clean. It will be up to the trial court to make the determination as to which, if any, of these claims should proceed further.

**JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER**

PROCEEDINGS IN ACCORDANCE WITH THIS OPIN-
ION.

COSTS TO BE SPLIT BETWEEN THE PARTIES.